L. E. FOSGATE COMPANY & others *vs.* BOSTON MARKET
TERMINAL COMPANY & others.

Suffolk.   January 12, 1931. — March 9, 1931.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & SANDERSON, JJ.

*Corporation,* Subscription to capital stock, Officers and agents.   *Contract,*
What constitutes.

To establish a terminal market and distributing center, certain indi-
viduals, partnerships and corporations engaged in the wholesale
fruit and produce business in Boston decided to form a corporation,
each concern agreeing to become a member to subscribe for stock to
the amount of $2,000.   An organization meeting accordingly was
called, the notices containing the following: "Points to remember: —
. . . B.   Only one member from any firm to be allowed one share of
stock, although other members may be present."   Thirty-two con-
cerns in July, 1922, formed the original corporation, with a capital
stock of $200,000 divided into shares of $100 each.   Each of the
original incorporators received one share and, less than a month
after the incorporation, each of twenty-nine of them signed an instru-
ment in which he subscribed for nineteen shares to be paid for in
cash at $100 per share, "the same to be accepted and paid for at such
time and times as said directors shall request."   The by-laws con-
tained no provision limiting the holdings of the several stockholders.
It seemed to have been assumed that a requirement of equality of
ownership of the stock existed with respect to the thirty-two shares
originally issued.   After the corporation began operation, other con-
cerns joined, each purchasing one share.   The enterprise proved
unexpectedly successful and in 1927 it became evident that there
would be large profits to be distributed.   The treasurer then sug-
gested "that it would be a good time to call in" the subscriptions
which had been made for nineteen additional shares, his reason being
that he felt that those "who had backed the organization from the
start . . . were entitled to have their subscriptions accepted and
the shares issued to them when the undertaking had become an as-
sured success."   Votes then were passed by stockholders and directors
accepting the subscriptions made five years before.   New capital was
not then needed by the corporation.   Dissenting stockholders brought
a minority stockholders' bill in equity against the twenty-nine sub-
scribers to the new stock, directors, and the corporation to set aside
the transaction.   A decree for the plaintiffs was entered.   The defend-
ants appealed.   *Held,* that
    (1) Since no definite time was specified in the instrument of sub-
scription, the offer was open for a reasonable length of time; and,

upon the facts appearing, it was not accepted by the defendant corporation within a reasonable time and had expired;

(2) The conduct of the defendant directors was in violation of the duty they owed as fiduciaries to exercise their authority in the utmost good faith;

(3) The honesty of purpose of the defendants was not a decisive test of the propriety of their conduct; the right of the plaintiffs to prevent an issue of stock by the defendants to themselves for their own gain did not rest on fraud but on the fiduciary duty of the directors;

(4) The decree was affirmed.

BILL IN EQUITY, filed in the Superior Court on January 27, 1928, and afterwards amended, described in the opinion.

The suit was referred to a master, who found as follows: "At the time said notices [of the meetings of the stockholders and directors at which were passed the votes which the plaintiffs sought to annul] were given and said votes were passed the defendant corporation did not need in its business the new capital which would come to it from the sale of stock to the nineteen share subscribers. The purpose of the officers in proposing that the subscriptions should be called was to give to the original incorporators who had agreed to back the organization to the extent of $2,000 each the advantages which would result from ownership of the stock to which they had subscribed."

Other material findings are stated in the opinion.

The suit was heard by *F. T. Hammond*, J., upon the master's report and objections and exceptions thereto, and by his order there were entered an interlocutory decree overruling the exceptions and confirming the report and the final decree described in the opinion. The defendants appealed.

*A. L. Taylor*, (*F. J. Johnson & R. P. Dellinger* with him,) for the defendants.

*J. Cavanagh*, for the plaintiffs.

CROSBY, J. This is a suit in equity brought in behalf of the plaintiff L. E. Fosgate Company, and other stockholders of the defendant corporation who desire to become parties thereto, against the defendant corporation, its directors and clerk, seeking to enjoin them from issuing

to themselves and certain other stockholders hitherto unissued shares of the authorized capital stock of the corporation for the purpose of securing control and obtaining a disproportionate share of the corporate assets. The case was referred to a master under the usual rule. The evidence not being reported, his findings must be taken as final unless inconsistent or plainly wrong. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 334. *Anagnosti* v. *Almy,* 252 Mass. 492, 500. *Nelson* v. *Belmont,* 274 Mass. 35, 39. By amendment to the bill sixteen parties were added as plaintiffs.

According to the findings of the master, the plaintiffs are individuals, partnerships and corporations each engaged in the wholesale fruit and produce business in the city of Boston, and each owning one share of stock in the defendant corporation. The defendant Boston Market Terminal Company is a Massachusetts corporation organized July 27, 1922, for the purpose principally of establishing and maintaining a fruit and produce market in the city of Boston. In the year 1922 and for some years previously the dealers engaged in the wholesale fruit and produce business in Boston had discussed the establishment of a terminal market for handling fruit and produce in order to get a distributing center for the wholesale trade. Prior to the organization of the corporation, largely attended meetings were held and invitations to attend these meetings were given generally to the wholesale dealers in Boston. It was finally decided to form a corporation for the purpose of securing a location for the terminal with suitable buildings and railroad facilities, the market to be solely for the use of receivers of wholesale car lots of fruit and vegetables. " Each concern agreeing to become a member of the corporation was to subscribe for its stock to the amount of $2,000." A meeting was planned for July 25, 1922, at which it was proposed to organize the Boston Market Terminal Company and notices were sent to those who had shown interest in the proposed corporation and willingness to

subscribe for stock to the amount of $2,000. The notices contained, among other things, the following announcement: " Points to remember: — . . . B. Only one member from any firm to be allowed one share of stock, although other members may be present." The organization meeting of the Boston Market Terminal Company was held on July 25, 1922, and thirty-two wholesale dealers attended and signed the articles of incorporation. Each of the incorporators subscribed for one share of stock and paid in cash the par value thereof. The authorized capital stock of the corporation was $200,000 divided into two thousand shares each of $100 par value. Thirty-two shares were issued, one to each of the thirty-two subscribers, among whom were the individual defendants and three of the plaintiffs. The by-laws contained no provision limiting the holdings of the several stockholders. All the plaintiffs were actively engaged in business in 1922 as wholesale fruit and produce dealers, all had actual notice of the meetings preceding incorporation and knew in a general way about the projected terminal market. All the plaintiffs, except two, knew of the original plan to require members to subscribe $2,000 towards the undertaking.

On August 16, 1922, twenty-nine of the thirty-two original subscribers, including all the defendants, signed the following subscription offer for nineteen additional shares of stock: " The undersigned, each for himself if an individual, for themselves if a co-partnership, and for itself if a corporation, doth each hereby subscribe for nineteen (19) shares of the capital stock of the Boston Market Terminal Company, and doth each hereby agree to pay for the same in cash at the rate of one hundred (100) dollars per share, the same to be accepted and paid for at such time and times as said directors shall request, and doth each hereby agree to hold such shares, together with the one share now owned by each of the undersigned, subject to such rules and regulations as are or may hereafter be contained in the By-laws of said corporation,

and as may hereafter be imposed from time to time by said directors." The master states that it seems to have been assumed that a requirement of equality of ownership of the stock existed with respect to the thirty-two shares originally issued. When one of the original subscribers died and another member acquired that share in addition to his own, he was obliged to dispose of one of the shares and he did so.

After the incorporation of the Boston Market Terminal Company the directors proceeded to work on different propositions for the establishment of the terminal market. They had numerous conferences with State and railroad officials looking toward the erection of a terminal, but the proposed schemes involved too great an expenditure and hence were abandoned. In the fall of 1926, after a series of negotiations, an arrangement was made with a railroad company by which certain freight houses in the railroad yards were to be remodelled and used as a terminal market by the defendant corporation. The agreement, dated October 15, 1926, provided that the premises would be used as a terminal for at least two years, and that the agreement might be cancelled thereafter by either party on six months' notice. The defendant corporation was to pay $3 for each car unloaded and promised to unload a minimum of three thousand cars per year. The terminal market as thus established was opened for business April 4, 1927.

During the period from December, 1926, to April, 1927, twenty wholesale dealers in fruit and produce who were not theretofore stockholders of the defendant company each subscribed and paid for one share of stock. Of these twenty new stockholders, fourteen are plaintiffs in this suit, the other three plaintiffs having been among the incorporators. The rules of the defendant corporation in force when these fourteen plaintiffs became stockholders required that dealers desiring to use the facilities of the terminal market must be stockholders. Late in April, 1927, the directors decided not to sell any more stock, and the regulations were changed so as to permit the use

of the terminal facilities to those who did not hold stock. The corporation did not need the money which came from the new subscriptions, but the officers desired to have as many as possible of the wholesale dealers become members of the corporation because it was important, in order to assure the success of the project, that a large number of dealers make use of the terminal. The new stockholders were not induced to subscribe by reason of any representations or promises that no shareholder was to hold more than one share of stock, or that they were to share equally in the management and earnings, although they were informed that in order to use the terminal each must own one share of stock, and that each concern then subscribing would be allowed only one share. During the period from August, 1922, until late in 1927, no action was taken on the subscriptions for nineteen additional shares because at no time was the money needed by the corporation. The subscribers were at all times ready to pay the amount of their subscriptions and to take up their stock.

In the summer of 1927 it became evident that there would be large profits to be distributed, the business conducted by the corporation having turned out to be unexpectedly successful. Thereupon the defendant Rolfe, treasurer of the corporation, suggested to the directors " that it would be a good time to call in " the subscriptions which had been made for nineteen additional shares. " His reason for the suggestion was that he felt that the people who had backed the organization from the start and had agreed to put up $2,000 to back it were entitled to have their subscriptions accepted and the shares issued to them when the undertaking had become an assured success." The directors approved the suggestion and held informal discussions regarding a distribution. Rolfe also consulted counsel on the matter. On January 24, 1928, adjourned annual meetings of the stockholders and the directors were held. At the stockholders' meeting it was voted: (1) that the subscription offers dated August 16, 1922, for five hundred thirty-two additional shares be accepted;

(2) that the sum of $52,560 of the "capital" assets of the corporation be distributed among the stockholders pro rata; and (3) that the lease and contract with the railroad company and the good will of the business be valued at $50,000 and be set up on the books of the corporation at that figure. At the directors' meeting it was voted: (1) that the subscriptions dated August 16, 1922, for the purchase of additional shares be accepted, and that the stock be paid for and issued on January 28, 1928; (2) that $52,560 of the "capital" assets of the corporation be distributed to stockholders of record as of February 1, 1928; (3) that the contract with the railroad company and the good will of the business be capitalized at $50,000; and (4) that two dividends, one of ten per cent and one of fifteen per cent, be paid from net earnings to stockholders of record as of February 1, 1928. At the time of these meetings fifty-two shares of the corporation were issued and outstanding. " The purpose of the officers in proposing that the subscriptions should be called was to give to the original incorporators who had agreed to back the organization to the extent of $2,000 each the advantages which would result from ownership of the stock to which they had subscribed." The vote to capitalize the contract with the railroad company and the good will was passed to avoid reduction of the capital assets below the amount of outstanding capital stock. Several of the plaintiffs who were present at the stockholders' meeting protested against the proposed action of the defendants.

After the master's report was filed, the case was heard by a judge of the Superior Court who ruled " that the so-called ' subscription agreement ' of August, 1922, constituted merely offers to take and pay for the stock subscribed for and not contracts to do so; that such offers were limited to being accepted by the corporation within a reasonable time; that the time from August, 1922, to January, 1928, was more than a reasonable time and that the offers contained in the subscription agreement had expired when the stockholders passed the vote accepting

them." He further ruled " that, under the circumstances disclosed by the master's report, the action of the majority stockholders in voting to issue additional shares to the persons signing the subscription paper of August, 1922, was in violation of the rights of the minority stockholders." An interlocutory decree was entered overruling the exceptions to the master's report and confirming the same, and a final decree was entered enjoining the defendant corporation and the other defendants from accepting the subscriptions of August, 1922, or any payments thereon, and enjoining the defendants from issuing any stock or taking any action in recognition of said subscriptions. The case is before this court on appeals from these decrees.

The " subscription agreement" of August 16, 1922, whereby the individual defendants subscribed for nineteen additional shares of stock, was a mere voluntary offer until acted on and accepted by the corporation. *Boston & Maine Railroad* v. *Bartlett,* 3 Cush. 224. *Sewall* v. *Eastern Railroad,* 9 Cush. 5, 12. *People's Ferry Co.* v. *Balch,* 8 Gray, 303, 311. *Athol Music Hall Co.* v. *Carey,* 116 Mass. 471, 474. *Hudson Real Estate Co.* v. *Tower,* 156 Mass. 82. Since no definite time was specified in the instrument, the offer was open for a reasonable length of time. As all the facts appear in the master's report, it is a question of law as to what was a reasonable time for the acceptance of the offer. *Park* v. *Whitney,* 148 Mass. 278. *Holland* v. *Cheshire Railroad,* 151 Mass. 231, and cases cited. *Starkweather* v. *Gleason,* 221 Mass. 552. *Chatham Manuf. Co.* v. *Avery Chemical Co.* 235 Mass. 340. What is a reasonable time depends upon the facts and circumstances of the case. *Loring* v. *Boston,* 7 Met. 409. The subscription agreement properly construed does not import perpetuity, it means that the stock to be issued must be issued within a reasonable time. The offer was not to continue forever, and upon the facts found by the master the judge rightly ruled that it was not accepted by the defendant corporation within a reasonable time.

It is argued by the defendants that " The purpose of the subscriptions was to provide for a fund which could be raised immediately and be at the disposal of the corporation for the purposes for which it was organized." The findings of the master support this argument. But he also found that the corporation in 1928, because of its great success, " did not need the money which would result from calling the subscriptions."

The individual defendants who were directors of the corporation were acting in a fiduciary capacity and were required to exercise their authority in the utmost good faith. *Stratis* v. *Andreson,* 254 Mass. 536. *Reed* v. *A. E. Little Co.* 256 Mass. 442, 448. *Abbot* v. *Waltham Watch Co.* 260 Mass. 81, 96. *Beaudette* v. *Graham,* 267 Mass. 7, 12. *Calkins* v. *Wire Hardware Co.* 267 Mass. 52, 66. They could not " rightly manipulate the affairs of the corporation primarily with the design of securing the control of the corporation to one particular group of stockholders, or of excluding another group from the exercise of its corporate rights." *Albert E. Touchet, Inc.* v. *Touchet,* 264 Mass. 499, 507. From the master's findings and the reasonable inferences to be drawn therefrom, it is manifest that the conduct of the defendants was in violation of the duty they owed the plaintiffs. Their sole purpose in voting to accept the lifeless offer of August 16, 1922, over five years after it had been made, was to secure for themselves and their associate subscribers a large and disproportionate share of the corporate assets at the expense of the minority stockholders. The honesty of purpose of the defendants is not a decisive test of the propriety of their conduct. The right of the plaintiffs to prevent an issue of stock by the defendants to themselves for their own gain does not rest on fraud but on the fiduciary duty of the directors. A necessary and obvious consequence of the issuance of the nineteen additional shares to the individual defendants and the other subscribers would have resulted in destroying the equality of stock ownership which had obtained since the organization of the corpora-

tion.  It is settled that the directors of a corporation cannot lawfully issue treasury stock to themselves or to a confederate for the purpose of gaining control of the corporation without giving the other stockholders an opportunity to subscribe.  *Elliott* v. *Baker*, 194 Mass. 518.  The attempt by the defendants to obtain for themselves a larger share of the assets and control of the corporation cannot be justified.

<div style="text-align:right">

*Interlocutory and final decrees
affirmed with costs.*