CUMMINGS, ET AL. *v.* UNITED ARTISTS
THEATRE CIRCUIT, INC., ET AL.

[No. 1, September Term, 1964.]

4

*Decided November 25, 1964.*

The cause was argued before HENDERSON, C. J., and HAMMOND, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ., and McLAUGHLIN, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*Stephen P. Duggan, Jr.,* with whom were *Simpson, Thacher & Bartlett, Richard Hawkins, Kenneth J. Kwit; Skadden, Arps, Meagher, Slate & Flom, Leslie H. Arps, Joseph H. Flom* and *Geoffrey M. Kalmus;* and *Piper & Marbury, J. Martin McDonough* and *Lewis A. Noonberg,* on the brief, for the appellants.

*Abreham L. Pomerantz,* with whom were *Pomerantz, Levy, Haudek & Block, Julius Levy; Weisman, Celler, Allan, Spett & Sheinberg, Milton C. Weisman* and *Adolph S. Kaufman; Frisch and Goldfluss, A. H. Frisch,* on the brief; and *Herbert M. Brune,* with whom were *Brune, Robertson & Iglehart* and *Harrison M. Robertson, Jr.,* on the brief, for the appellees.

SYBERT, J., delivered the opinion of the Court. HORNEY, J., and McLAUGHLIN, J., specially assigned, dissent. Dissenting opinion by HORNEY, J., at page 27, *infra,* in which McLAUGHLIN, J., concurs.

This is an appeal by Maxwell Cummings and other complainants below from two decrees of the Circuit Court of Baltimore City (Oppenheimer, J.), entered in two equity actions, each denying an injunction to restrain consummation of an "Agreement and Plan of Reorganization" (hereinafter called "Exchange Agreement") which had been entered into by one of the appellees, United Artists Theatre Circuit, Inc. (United Artists), with Michael and Marshall Naify and other members of the Naify family, who are the other appellees. By agreement of the parties the two equity suits were consolidated for trial with a mandamus action, the subject matter of which was closely related to the equity actions, and the court handed down the three decisions simultaneously. Although there was no appeal from the decision in the mandamus action, the close relationship of the three suits will necessitate some reference to the mandamus case later in this opinion. The two equity suits will be treated together, as was done below, since the only significant difference between them is that all parties to the Exchange Agreement are joined as defendants in the second injunction action, whereas in the first only United Artists is the defend-

ant. The suits were originally instituted by appellant Maxwell Cummings of Montreal, Quebec, a director and shareholder of United Artists. However, the complaints were subsequently amended to include 17 other shareholders as complainants, and the actions were made representative.

A relatively brief examination of the facts leading up to the execution of the Exchange Agreement will be helpful.[1] United Artists is a Maryland corporation with its principal place of business in New York which, directly and through affiliated companies, is engaged in the motion picture exhibition business. It is a publicly held corporation with an authorized capital stock of 1,600,000 shares of a single class of common stock traded in the over-the-counter market. Since 1950, George P. Skouras had been the president of United Artists and for several years had been the chairman of the 13-man board of directors. (He died soon after the trial below.) One of United Artists' principal stock interests is in United California Theatres, Inc. (United Cal), a Nevada corporation, which is in the motion picture exhibition business and in the real estate business, from the latter of which about one-half of its income is derived. United Artists since 1949 owned 50% of all the issued stock of United Cal and the Naify family owned the other 50%. Michael Naify, the father of the Naify clan, was chairman of the 8-man board of directors of United Cal and in fact controlled and operated United Cal. Two of Naify's sons, Marshall and Robert, served as president and vice-president of United Cal. There were interlocking directors of the two corporations— four directors served on both boards: George P. Skouras, Marshall Naify, Salah M. Hassanein, and A. E. Bollengier.

When Skouras became president of United Artists, it was in a declining financial situation (it actually lost money in 1951), apparently due in part to the poor location of some of its theatres.

---

1. The trial in the lower court lasted 14 days and produced a transcript of over 2400 pages and over 100 exhibits. In addition, depositions of more than 1200 pages were introduced in evidence. The court, in addition to a lengthy opinion, filed 40 individual findings of fact. This Court in its discussion of the facts will not attempt to be exhaustive.

However, United Cal was in good financial condition. But instead of issuing substantial dividends Michael Naify plowed back most of United Cal's earnings into that corporation. Skouras became dissatisfied with the returns United Artists was receiving from its 50% ownership of United Cal and as early as 1952 made overtures to Michael Naify in regard to some kind of unification of United Artists and United Cal.

Although Michael Naify and Skouras had been close friends and business associates for many years, Skouras had never dominated Naify and was unable to shake him out of his rather conservative operation of United Cal. From 1952 to 1962 Skouras made intermittent overtures to Naify. Several meetings were held but each time Naify rejected any proposal for unification.[2] The negotiations with the Naifys were mainly carried out by Skouras though at times others took over negotiations. Hassanein was one but more frequently Arnold C. Childhouse—a director of United Cal and a designee of United Artists—was the negotiator. (United Artists and the Naify fam-

---

**2.** Unification with United Cal was just one facet of a complex plan of United Artists to strengthen its economic outlook. On January 25, 1955, United Artists issued a Prospectus in connection with the public sale of some 400,000 shares of its common stock which contained the following statement under the heading "Plans for Consolidation": "The management of UATC for some time has been working on a plan to consolidate into UATC or otherwise unify some or all of the companies in which it has a direct or indirect interest. The acquisition of the outside interests in these companies is hoped to be achieved through the issuance of common stock, and 600,000 shares of common stock that have been authorized but are unissued are available for this purpose.* * * In the opinion of management, the acquisition of these interests will make for a more integrated operation of those theatres in which UATC has an interest but which are not presently operated by UATC, resulting in definite economies and also improving the current position of UATC." In the same year, in furtherance of the plan, United Artists, which owned 50% interest in Rowley Theatres, bought the other 50%. In 1962 an agreement of settlement was entered into with several other parties whereby there would be an exchange of stock between United Artists, Skouras Theatres Corp., and Metropolitan Playhouses, Inc. This agreement is known as the "Eastern Reorganization" and its fairness and reasonableness are now before the courts of New York.

ily each had the right to appoint four members to the United Cal board.) In 1960, at the invitation of Skouras, Marshall Naify became a member of the United Artists board to help familiarize the Naifys with the affairs of United Artists. Maxwell Cummings began acquiring shares in United Artists in February 1962 and became a director in July 1962, following discussion with Skouras.

On February 23, 1962, Skouras wrote to Michael Naify. (It should be noted that Skouras did not meet Cummings until May or June 1962.) In his letter, Skouras mentioned again his long standing dissatisfaction with the United Artists' return on its United Cal investment, and went on to state that the bankers of United Artists were also dissatisfied and that their pressure might require him to exercise the power under the contract between United Artists and the Naifys to have a neutral chairman of United Cal's board appointed if United Cal's dividend declarations were not increased, but Skouras indicated that he did not favor such a move since he thought a merger or buy-or-sell deal would be best for all concerned. Michael Naify answered this letter on March 2, 1962, rejecting the merger proposal but leaving the door open for negotiations on the basis of a buy-or-sell deal. In the fall of 1962, Skouras proposed to purchase the Naifys' half interest in United Cal for $7,200,000 but this proposal was rejected by the Naifys. At the time of this rejection, or sometime later, Marshall Naify suggested to Skouras that the Naifys exchange their shares of United Cal stock for 1,200,000 shares of United Artists stock. Skouras rejected this.

Cummings apparently became aware of Skouras' desire to unify the operations of United Artists with United Cal at least as early as May or June 1962, when he first met Skouras. According to Cummings' own testimony, he had in mind some kind of shake-up of the United Artists management even when he first began to purchase shares. He specifically wanted Skouras to resign as president; apparently, however, he did not mention this to Skouras until early 1963, some nine months after he had become a director. Although Cummings desired a change in management, he seemed during the period from July 1962 until perhaps May 1963 to have been in favor of the general

reorganization plans of United Artists—including the Eastern Reorganization (see fn. 2 *ante*) and the unification with United Cal. In early 1963, as noted, he for the first time made his desires regarding the United Artists management known to Skouras. At that time he proposed, among other things, that Skouras step down as president of United Artists, and that Cummings be allowed to name six directors to the 13-man board of United Artists. Skouras rejected these proposals.

There followed several other proposals by Cummings in early 1963, including an offer to buy all of the United Artists stock owned by the Skouras family. Again these proposals were rejected, but the discussions between Skouras and Cummings led to Skouras writing a letter to Marshall Naify[3] on April 15, 1963. Apparently Cummings knew of the letter, and Skouras testified that Cummings consented to its contents. In the letter Skouras stated that he had had several conversations with Cummings and that Cummings was becoming impatient with the slow progress of negotiations with United Cal and that Cummings had suggested, among other things, that he buy Skouras out and then pursue negotiations with the Naifys with more vigor to effect a merger, or to buy out United Cal, or to bring about a buy-or-sell deal, but if not successful, to bring about the dissolution of United Cal. Skouras noted that Cummings's suggestions would probably lead to litigation and that therefore the best thing to do would be for Skouras and the Naifys to find a solution themselves.

On April 26, 1963, Marshall Naify replied to Skouras's letter after discussing it with the Naify family. He stated that the family was still opposed to a merger, but that if necessary a buy-or-sell deal might be accepted. Although the language of this letter does not indicate it, the Skouras letter apparently caused great concern on the Naifys' part. The result was that negotiations between United Artists and the Naifys were accelerated. The Naifys called in attorneys and in May 1963 negotiations between Hassanein, for Skouras, and Michael Naify

---

3. Because of Michael Naify's bad health, negotiations were often made with Marshall Naify, who then discussed them with his father and other members of the family.

led to a proposal by the Naifys to exchange their half interest in United Cal for 1,000,000 shares of United Artists. Before and during these negotiations, Cummings, as noted, was proposing to Skouras several methods of changing United Artists management. In late May 1963, after Skouras had rejected all previous proposals, Cummings informed him that he with other shareholders intended to begin a proxy fight for control.

On May 23, 1963, United Cal announced a special meeting of its board of directors to be held on June 3, 1963. At Skouras's request the meeting was rescheduled for July 10 or 11, 1963. The meeting, which Skouras attended, resulted in an agreement reached about August 2, 1963, under which the Naifys would exchange all of their shares in United Cal for 725,000 shares of United Artists.

By that time the proxy fight was beginning to take form. In late June 1963 Cummings had made written demand upon United Artists for a list of shareholders and on July 30, 1963, Cummings and six other stockholders requested a special meeting of the shareholders to take action on the removal of all directors, except Cummings, and to elect their successors. On August 5, 1963, notice of a regular monthly meeting of the United Artists board of directors to be held on August 7, 1963, was mailed to the directors. No specific reference to the terms of the Naify-United Artists agreement was made but the letter did mention that the president would submit a report on the proposed acquisition of the remaining 50% interest in United Cal and that action would be taken thereon.[4] On August 6, 1963, further negotiations were had at the request of the Naifys and it was decided that the Naifys would receive 740,000 shares of United Artists stock, rather than 725,000. (The lower court found that the Naifys demanded this increase "to compensate the Naifys for the contingent liability of United Artists on an income tax deficiency judgment.")

On August 7, 1963, the scheduled directors' meeting was held.

---

4. No notice was required for this meeting as it was a regular meeting and the letter was a mere reminder. In fact, Cummings had already left for the meeting in New York when the notice reached Montreal.

Of the 13-man board, only three directors were absent.[5] Skouras began the discussion of the Exchange Agreement by summarizing the negotiations leading up to it, explaining the properties of which United Artists would acquire control by buying out the Naifys and finally stating briefly how the acquisition was to take place. Marshall Naify then left the meeting and did not return until after the board moved on to other business.

After Skouras completed his report, Cummings asked where the United Artists stock which was to be exchanged was to come from. He was told that it would come from four sources: 9,400 shares from the United Artists treasury, 450,134 shares were authorized but then unissued, 257,707 shares were to be purchased from Sainte Claire Theatres, Inc. (whose own shares were owned half and half by United Artists and United Cal), and 22,759 shares were to be acquired from United Cal. At the request of Jervis J. Babb, a director, Bollengier, financial vice-president and treasurer of United Artists, reported on the total assets and net worth of United Artists and United Cal individually and together. He distributed to the board members five schedules, which had been prepared at the request of Skouras, showing the past earnings of United Cal and United Artists and showing the projected effect of the stock acquisition on the earnings. Arnold Childhouse, a director and treasurer of United Cal (by designation of United Artists), then presented an oral report evaluating United Cal, including individual evaluation of all of United Cal's properties. Cummings asked whether any valuation of United Artists' properties had been made as had been done for United Cal and was answered in the negative.

5. Of the three directors not present, only one had been consulted in regard to the Exchange Agreement. Among the directors present were George P. Skouras, S. M. Hassanein and A. E. Bollengier, all of whom were also United Cal directors, and Marshall Naify, president of United Cal and member of its board and of the United Artists board and also one of the parties to the Exchange Agreement. Under the terms of the Exchange Agreement, Marshall Naify was to receive 81,955 shares of United Artists stock in exchange for his shares in United Cal. Also he was to receive as trustee for Michael Stephen Naify 15,525 shares and as trustee for Marsha Naify 15,525 shares.

Cummings suggested that one be made but the board did not agree. He then asked that the matter be submitted to the shareholders of United Artists for approval. Mr. Frisch, secretary of United Artists, stated that Maryland counsel had advised that shareholder approval was not necessary. Frisch, who is also counsel for United Artists, presented to the meeting a copy of the Exchange Agreement and summarized its provisions paragraph by paragraph. Cummings then requested that action on the matter be postponed to give him time to study the agreement. The board rejected this suggestion. The agreement was then approved with only Cummings voting in the negative. He gave as his reason that he needed time to examine the agreement.

Marshall Naify then returned to the meeting. The board moved on to the written demand for a special shareholders' meeting which had been filed with the corporation on July 30, 1963. Frisch stated that special counsel had advised in a written opinion that the request did not conform to Maryland corporation law or to the by-laws of the corporation. The opinion stated that the number of shareholders demanding the special meeting was not sufficient. The request for the special meeting was denied, with only Cummings voting in the affirmative. The board then considered a demand by Cummings to inspect records of United Artists, which also had been filed on July 30, 1963. Frisch stated that upon advice of special counsel the demand need not be complied with. It was rejected, Cummings alone voting in the affirmative. The board then appointed a proxy committee to take action in the proxy fight which was already under way. Cummings abstained from voting in this connection. Forty-five minutes after the meeting was adjourned the Exchange Agreement was executed with Marshall Naify signing on behalf of the Naify family.

Under the terms of the Exchange Agreement an August 30, 1963 closing date was set (subject to tax clearance). On that date, United Artists was to have all of the 740,000 shares of its stock ready for exchange for all of the Naify family's stock in United Cal. One of the effects of the consummation of the Exchange Agreement would be that the Naifys would hold about 46% of the shares of United Artists.

On August 9, 1963, Cummings filed a petition for a writ of mandamus in the law court below. He prayed that the court order the board of directors of United Artists to call a special meeting of its shareholders for the purpose of removing all of the directors except Cummings and to elect their successors, since the board had refused a request to call such a meeting. On the same day Cummings filed a suit in equity to enjoin United Artists from consummating the Exchange Agreement. On August 22, 1963, a second equity suit was instituted asking for the same relief as in the first but requesting that all parties to the agreement be enjoined from consummating it. (As noted above, these complaints were subsequently amended to include other shareholders as complainants besides Cummings.)

In the mandamus action Cummings asked for summary judgment and in the equity suits asked for injunctions *pendente lite,* but by stipulation it was agreed that all three cases would be tried together and that the Exchange Agreement would not be consummated until after the decision in the court below. The lower court handed down its decisions on December 5, 1963,[6] ordering United Artists board of directors to call a special meeting of its shareholders[7], but refusing to enjoin the consummation of the Exchange Agreement. In the latter connection Judge Oppenheimer found, in effect, that the exchange of stock with the Naifys was not only fair, but indeed critical, to

---

6. The opinion and findings of fact were filed on December 3; the order and decrees were filed on December 5; and the writ of mandamus was issued on December 6.

7. Briefly stated the question presented in the mandamus action was whether the demand for a special meeting was made by the holders of 25% of the shares of United Artists as required by Code (1957), Art. 23, sec. 38(c). The answer to this question turned on whether certain United Artists shares held by Sainte Claire Theatres, Inc., were owned indirectly by United Artists. The court below held that for the purposes of the demand for a special meeting the shares held by Sainte Claire were not outstanding within the meaning of Code (1957), Art. 23, sec. 43(b)(1), and that thus 25% of the outstanding shares had requested the meeting and the board had wrongfully refused to accede to the demand.

the United Artists corporation, and that the principal motivation of the agreement was not to frustrate the attempt by Cummings and others to change the company's management, but rather to serve a legitimate, corporate purpose in that "Substantial economies could be effected with California's virtual freedom from debt and high cash reserves; there could be better management of the debt of United Artists with savings in refinancing; with United Artists' losses in operation and California's consistent record of profits, there would be substantial tax savings; there could be a uniform purchasing organization for the hundreds of motion picture theatres owned or operated by the two companies; there could be more effective management of the theatres for the better use of executive personnel; and large losses in the operation of the threatres which United Artists operates under long-term leases could be eliminated by cash settlements."

On the same day upon which the order and decrees were filed, Cummings filed a post trial motion in the mandamus action for leave to amend his prayer for relief to include a request that the court order the defendants to refrain from consummating the Exchange Agreement pending the holding of the special shareholders' meeting. The court denied leave to amend. There is now no appeal from the mandamus decision but only from the two equity decisions. The Exchange Agreement was actually consummated by exchange of the stock after the decision below and a special shareholders' meeting was held pursuant to the writ of mandamus, but a majority of the shareholders (as augmented by the shares issued to the Naifys) voted against removal of the directors.

## I

The first contention of the appellants is that the lower court erred in refusing to enjoin the consummation of the Exchange Agreement, after finding in the mandamus action that it was executed during the continuance of a wrongful denial of a special meeting of shareholders. The relief granted, they say, was incongruous. They argue that the board of directors could not enter into the Exchange Agreement while unlawfully denying the request for a special shareholders' meeting and that the agreement entered into under such circumstances is void re-

gardless of fairness. And, they add, the illegality of the board's action at the August 7 meeting is compounded by the fact that the directors knew a majority of the shareholders was opposed not only to the Exchange Agreement but also to the continuance in office of the members of the board, except Cummings.

There is no real evidence that the board's refusal to call a special shareholders' meeting was not made in good faith. On the contrary, the board acted on the advice of experienced counsel and although this advice proved to be erroneous the legal question involved was not a simple one. The court below was able to reach a decision in the mandamus action only after full consideration of the facts and law developed in a complete trial on the merits. Moreover, as we shall develop hereafter, the board had to make a choice between accepting an advantageous offer that might well be lost by delay, or risking the loss of the transaction by postponing action thereon and calling the special meeting, which they had been advised they need not do.

In support of their position the appellants quote the following from the opinion of Judge Learned Hand in the case of *Moore v. Linahan,* 117 F. 2d 140, 144, (2 Cir. 1941), cert. den., *sub nom. Sargent & Co. v. Moore,* 314 U. S. 628 (1941) :

> "* * * although directors, so long as they hold office and use an honest judgment, are immune from the control of their shareholders * * * the power to commit a corporation one day before they know they are to be displaced, to a course known to be disapproved by the majority is not one to be generously extended. Normally the shareholders should have their way."

The Maryland cases support the general rule as stated by Judge Hand at the beginning of the quotation, *Rolling Inn, Inc. v. Iula,* 212 Md. 596, 130 A. 2d 758 (1957), and cases cited, but we find nothing in the record of the instant case to bring it within the exception recognized in the balance of the quotation. There is no showing that the United Artists board did not act in good faith. In regard to the allegation that the board knew a majority of the shareholders was opposed to the Exchange Agreement and to the continuance in office of the members of

the board, other than Cummings, the evidence does not show that a majority of the shareholders would have voted against approval of the Exchange Agreement or would have replaced the board members if given the opportunity. As a matter of fact the lower court found that Cummings had cooperated with Skouras during the negotiations with United Cal in early 1963. Unlike the *Linahan* situation, the evidence here supports the court's finding that the United Artists board at the August 7 meeting passed on a matter which it in good faith believed to be for the benefit of the corporation and which was the culmination of at least ten years of negotiations.

The appellants rely on *Lazar v. Knolls Cooperative,* 130 N. Y. S. 2d 407 (Sup. Ct. 1954), as being directly in point, but we think the case differs substantially from the one before us. In *Lazar,* the court found that the directors of the corporate defendant had improperly refused to call both an annual meeting and a special meeting of stockholders to consider the removal of directors. The court ordered the directors to call both meetings and further granted the plaintiff stockholder's motion for an injunction prohibiting the corporation from making a final payment to a partnership, in which some of the corporate officers and directors were interested, for construction of an apartment house for the corporation, until the meetings had been held. But we find the case distinguishable from the one at bar in three ways. (1) The directors in office in *Lazar* were the original incorporators of the cooperative. The New York court held in effect that the board was illegally constituted at the time of the transaction there in question, because under the State's Cooperative Corporations Law the members were to serve only until the first annual meeting of stockholders, which under the law the interim directors should have called many months previously, but had failed to do. (2) In the by-laws of the cooperative a date was set for the first annual shareholders' meeting but the court found that since no meeting had been held the board was violating its own by-laws. (3) The shareholders of the cooperative had demanded the calling of a special shareholders' meeting for the stated purpose of considering the removal of directors, but the board had refused. The court pointed

out that under the New York statute dealing with the calling of special shareholders' meetings of cooperative corporations there was a specific requirement that a meeting for the removal of directors be held "promptly". In the case before us the board of directors on August 7 was a duly elected board and not an interim one which had refused to call a first annual shareholders' meeting; there was no violation of a United Artists by-law by the action of the board; and, in contrast with the New York law, the Maryland statute relating to special shareholders' meetings fixes no time when such a meeting must be held.

Appellants also cite three other cases, *Glenn v. Kittanning Brewing Co.,* 103 Atl. 340, 259 Pa. St. 510 (1918); *Trask v. Chase,* 77 Atl. 698 (Me. 1910); and *Kullgren v. Navy Gas & Supply Co.,* 135 P. 2d 1007 (Colo. 1943), to support their contention that the action taken by the board of directors on August 7 was unlawful regardless of the fairness of the Exchange Agreement. However in all of these cases the court found that either the sole or primary purpose of the board of directors' action was to place or perpetuate control in themselves. Since here there was evidence from which Judge Oppenheimer could find, as he did, that the action taken by United Artists' board was primarily for a good corporate purpose, the cases cited are not in point.

Therefore we hold that where a lawfully constituted board of directors denies a request for a special shareholders' meeting in good faith and then continues to act as a board of directors in carrying on the business of the corporation in a manner which appears best to serve the interests of the corporation, an agreement entered into without fraud or bad faith by the board during such time is not necessarily void. Although the appellants say that such a holding would have the effect of allowing a board to forestall adequate control by the shareholders, a contrary holding would have the effect of preventing a board of directors from carrying on the business of the corporation without frequent resort to the courts. While the appellants do not claim that a board of directors should not be able to carry on any business while refusing to call the special meeting, they contend that where an action has an effect on the control of the

18

corporation, the board may not act. But we think that where the primary purpose of the action is to further a good corporate purpose and it is taken in good faith, the rule suggested would unduly limit the power of the board. The board of directors may exercise all the powers of a corporation except such as are by law, charter or by-laws reserved to the stockholders. Code (1957), Art. 23, sec. 52(a); see also Art. 23, sec. 9 (a)(7). Therefore under the facts of this case the relief given was not incongruous.

## II

The second major contention of the appellants is that the court below "erred in refusing to enjoin the consummation of the Exchange Agreement, since the motive of such agreement was to frustrate a change in the management of United Artists". In the case before us there were interlocking directors between United Artists and United Cal and Marshall Naify not only sat on both boards but also was one of the parties to the Exchange Agreement. Although he did not actually participate in the discussion and voting at the August 7 meeting, he nevertheless took an active part in the negotiations leading up to the agreement. Putting aside for the moment the question of motivation, we must first decide whether under the other circumstances of the case fairness should be a test in upholding the validity of the agreement. As we said earlier, the mere fact that the agreement was approved by the board during the wrongful refusal to call a special shareholders' meeting does not of itself invalidate the agreement, but the question here is whether the added circumstances of the interlocking directors and Marshall Naify's participation prevent judicial consideration of the fairness of the agreement.

Even with respect to the involvement of Marshall Naify, the generally accepted rule is that fairness is the proper test. In his treatise on the law of corporations, Professor Lattin, referring to situations similar to the one before us, states:

"Where the director's presence is not necessary to constitute a quorum and his vote is not required to carry the resolution, most courts hold the transaction valid if fair to the corporation * * *. This rule is prac-

> tical and tends to produce the sort of contract or other transaction which strict adherence to directoral duty, in other circumstances, tends to produce—that is, a fair contract. It gives the corporation protection in case of an unfair contract which is all the protection it needs."

Lattin, *Law of Corporations,* Ch. 6, sec. 12, p. 258. The author's statement of the rule is supported by other text writers. See Henn, *Handbook of the Law of Corporations,* sec. 239, p. 374; 3 Fletcher, *Cyclopedia of the Law of Private Corporations,* sec. 962, p. 437. The Maryland cases recognize the stated rule. See *Rolling Inn, Inc. v. Iula, supra; Indurated Concrete Corp. v. Abbott,* 195 Md. 496, 74 A. 2d 17 (1950); *Williams v. Ice Co.,* 176 Md. 13, 3 A. 2d 507 (1939); *Cumb. Coal & Iron Co., et al. v. Parish,* 42 Md. 598 (1875). Here, although Marshall Naify was very much concerned in the outcome of the discussion of the Exchange Agreement at the August 7 meeting, he in no way concealed this interest. The members of the board were fully aware of Marshall's involvement since there was a full disclosure to the board of the negotiations leading up to the agreement.

As to the existence of the other three interlocking directors, a statement made by this Court in the *Ice Company* case, *supra* (at pp. 22-23 of 176 Md.), is apposite: "[I]t is well settled that the mere circumstance that three of the defendant's board of directors are also directors of the competing corporation, in itself does not afford sufficient ground of presumption against the legality and fairness of the above [dealings with the competing corporation], or any other transaction between the two companies. In other words, while actual fraud will affect the result in any case, the fact that two corporations have common directors does not of itself invalidate a transaction between them." No fraud on the part of the interlocking directors was shown. Therefore the circumstances surrounding the approval of the Exchange Agreement do not make the fairness test inapplicable unless there is merit to the appellants' contention that motivation of the board of directors is significant here.

The court below found that there were at least two motives

for the board's action in approving the Exchange Agreement: the fear that Cummings might gain control of United Artists, since at least Skouras preferred the Naifys over Cummings; and the belief that the consummation of the agreement would serve a legitimate corporate purpose. The appellants maintain, however, that the court was in error in not finding that the fear of Cummings' assumption of control was the principal motivation for the board's action; and they contend in the alternative that the mere finding by the lower court that the fear of Cummings' assumption of control was a motivating factor required a holding that the agreement was invalid regardless of fairness. They cite several cases to support their alternative contention. The only decision of this Court cited is *Mtge. Bond Ass'n v. Baker,* 157 Md. 309, 145 Atl. 876 (1929), which involved the issuance of shares of stock by a board of directors. Although this Court held the issuance of the shares invalid, a close examination reveals that it is not authority for the appellants' position here. In the opinion it was stated (at p. 321 of 157 Md.) : "But the acknowledged purpose of this issue was to lodge control in the Baker faction, and that only, not to raise capital needed for the corporation, or in the course of its business of dealing with borrowers." Therefore this case is only authority for the proposition that where a control motivation is the sole purpose for the board's action courts will not uphold the transaction.

The cases from other jurisdictions cited by the appellants, while they do appear to go further than the Maryland cases, do not go as far as the appellants contend they do. In *Trask v. Chase, supra,* 77 Atl. 698 (Me. 1910), which involved the issuance and sale of stock so as to manipulate control, although the court did not hold that it was necessary that manipulation of control be the sole purpose of the transaction, it did state that it must at least be the primary purpose. The court in *Luther v. C. J. Luther Co.,* 94 N. W. 69 (Wis. 1903), held that the issuance of shares of stock by the directors was a breach of their duty as directors since the lower court had found that the purpose was to take control of the corporation from one faction and transfer it to another. In *Elliott v. Baker,* 80 N. E. 450 (Mass. 1907), the court found that the directors did not

act in good faith in the issuance of stock and that there was a secret understanding relative to manipulation of control of the corporation. Two other cases relied on by the appellants, *Yasik v. Wachtel*, 17 A. 2d 309 (Del. Ch. 1941), and *L. E. Fosgate Co. v. Boston Market Terminal Co.*, 175 N. E. 86 (Mass. 1931), involved situations where either there was no corporate purpose or the primary purpose related to manipulation for control. Thus the cases relied on by the appellants do not support their contention that where a board of directors has as one of its motives manipulation for control the transaction is invalid, regardless of fairness, and regardless of whether a legitimate corporate purpose is also being served. Some of the cases do support the proposition that if manipulation for control is a primary or principal motivation for board action the transaction may be invalid.

This brings us to the appellants' contention that the court below erred in not finding, as a matter of law, that manipulation for control was the principal motivation for the board's action on August 7. In view of the evidence, however, we do not find that the lower court was wrong in its determination that the principal motivation was to serve the best interests of the corporation. Although it is true that the negotiations with the Naifys became accelerated after Cummings informed Skouras that he intended to wage a proxy fight, it is uncontradicted that negotiations had been going on for a period of ten years prior to that time. All members of the board, including Cummings, were well aware of the fact that Skouras and, apparently, the other directors, had long desired a unification of some kind with United Cal. The court below specifically found that United Artists needed additional working capital and that the United Cal operation would furnish it with considerable assistance in this regard. Cummings' threat merely added impetus to negotiations already in progress. There is no merit to the suggestion that Skouras had the board enter into this agreement to perpetuate his control. The control, it is true, would be transferred to the Naifys who were on friendly terms with Skouras, but there is no evidence of an agreement, express or implied, under which Skouras would retain actual control. The appellants contend, however, that there is no significant dif-

ference between directors perpetuating control in themselves and merely transferring it to a friendly group. Even if we assume, without deciding, that in a proper case this contention would be of merit, under the facts before us where the lower court had before it sufficient evidence to find that the principal motive was not related to control, the effect on control caused by the board's action is not of compelling significance.

To support their contention that the primary motivation for the action taken on the Exchange Agreement related to control, the appellants state that the agreement was negotiated and approved with such speed and in such secrecy that the board did not have an opportunity to consider the advantages which it was claimed it would bring to the corporation. The appellants also maintain that the agreement was completely one-sided in favor of the Naifys, that inadequate information was presented to the board of directors on August 7, and that there was a complete absence of any prior valuation of United Artists' properties before the board approved the agreement. The court below specifically found that action on the agreement by the board at the August 7 meeting was proper in all respects, considering that the board members were generally familiar with the negotiations leading up to the agreement and with the assets and financial standing of United Artists, and that after ten years of negotiations, Michael Naify was finally (but possibly only momentarily) in favor of the exchange, and that because of Naify's personality the opportunity could quickly disappear. We feel that the factors mentioned above surrounding the approval of the Exchange Agreement relate primarily to its fairness and not to the motivations behind its approval.

Therefore we hold that where a good corporate purpose is being furthered and is the principal motivation for an action by a board of directors, the fact that the consummation of such transaction may have some effect on the control of the corporation is immaterial and the agreement will stand or fall depending on whether it is fair to the corporation.

### III

The appellants claim that the court below erred "in refusing to enjoin the consummation of the Exchange Agreement, since

such agreement effected a *de facto* merger without requisite shareholder approval". Code (1957), Art. 23, sec. 66(d), requires a favorable vote by holders of two-thirds of the shares in order to accomplish a merger. We agree with the court below that the facts in the case do not support the argument that the Exchange Agreement effected a de facto merger. It would seem that in order for a court to find a de facto merger situation most of the elements of a formal merger must be present with the obvious exception of a specific designation of the agreement as a merger. Henn, in his *Handbook of the Law of Corporations* (*cit. supra*), states in sec. 346, at p. 543, that:

> "\* \* \* in the case of a merger one or more corporations merge into another with the result that the former cease to exist and the latter's corporate existence continues \* \* \*
>
> "\* \* \* the continuing corporation, as of the time of merger \* \* \* takes over the assets of the constituent corporations and assumes their liabilities, and issues its stock, on some fair basis, in exchange for the stock of the constituent corporations."

Here none of the elements mentioned is present. The appellants rely on several out-of-state decisions to support their contention. Judge Oppenheimer carefully analyzed each case cited by the appellants and concluded that they were all distinguishable on their facts. We agree with his analyses and therefore deem it necessary to discuss only one of the cases. *Applestein v. United Board & Carton Corp.*, 159 A. 2d 146 (N. J. Super. 1960), is representative of all the cases relied on by the appellants. In that case the court held (at p. 154) that "\* \* \* every factor present in a corporate merger is found in this corporate plan, except, perhaps, a formal designation of the transaction as a 'merger'." The court found that there was a transfer of all the shares and all the assets of one corporation to the other; an assumption of all the liabilities of the one corporation by the other; a "pooling of interests" of the corporations; the dissolution of one of the corporations; the combination of the officers and directors of both corporations; and the shareholders of the dissolved corporation would surrender their shares and receive

newly issued shares of the surviving corporation. Even if we assume, without deciding, that all the elements of a formal merger, except the designation as such, need not be present for a court to find a de facto merger, in the case before us no elements of a formal merger are present. We agree with the court below that there is no evidence that United Cal would not continue to exist as a separate corporate entity as a wholly owned subsidiary of United Artists. As the court pointed out, the Delaware courts have refused to find a de facto merger in situations more closely resembling a merger than the one before us. See *Fidanque v. American Maracaibo Co.,* 92 A. 2d 311 (Del. 1952). But for our purposes a statement made by the court in *Orzeck v. Englehart,* 195 A. 2d 375, 377 (Del. 1963), is of more importance: "* * * the purchasing corporation is not the owner of the assets of the other corporation, but is merely a stockholder with all the incidents of such. Nor do the corporate identities merge by reason solely of the purchase by one of all of the other's stock." Therefore upon the present record we cannot agree that a merger was either contemplated or effected, since no elements of a merger appear in the agreement, express or implied.

The appellants argue that if this Court does not find that the agreement amounted to a de facto merger, it should find that the management of United Artists can very easily bring about a merger without shareholder approval under the provisions of Code (1957), Art. 23, sec. 67. Although it is true that under this section a parent corporation may be able to merge into it a wholly owned subsidiary without shareholder approval, it is purely speculative whether such action will eventuate here.

### IV

This brings us to the contention of the appellants that the court below erred in finding that the Exchange Agreement was fair. It should be noted that it placed the burden of proving the fairness of the agreement on the board of directors, apparently applying the fiduciary duty rule rather than the business judgment rule. See *Ross Transport, Inc. v. Crothers,* 185 Md. 573, 45 A. 2d 267 (1946) ; see also *Warren v. Fitzgerald,* 189 Md. 476, 56 A. 2d 827 (1948). We find it unnecessary to decide

whether the court applied the proper rule since under the circumstances of this case it would appear that the requirements of the stricter rule were satisfied.

As noted earlier, the trial lasted fourteen days and a substantial part of the testimony related to the fairness of the Exchange Agreement. Several financial experts were called as witnesses by both sides and the court had the opportunity to evaluate the substance of their statements as they were made. The court devoted an extended portion of its opinion to a discussion of the fairness of the agreement. Therefore we do not deem it necessary to discuss the question of fairness in great detail.

As we have said, the court below correctly found that the August 7, 1963, directors' meeting gave adequate consideration to the Exchange Agreement considering all the circumstances involved. The appellants contend that the agreement was one-sided in favor of the Naifys. Although it is true, as the lower court found, that the warranties and representations contained in the agreement were almost entirely those of United Artists, we agree with its conclusion that this alone would not render the agreement unfair. United Artists as a corporation was dealing with the Naifys as individuals and it is uncontradicted that the Naifys were relatively uninformed as to the affairs of United Artists. A closely related contention is that the Naifys were furnished with complete information relative to the financial condition of United Artists prior to the execution of the agreement and that all protective terms that the Naifys desired to have placed in the agreement were included therein. As the court found, the Naifys were taking the risks in entering into the agreement since the annual statements of the two corporations showed that United Artists had heavy obligations whereas United Cal's debt was relatively small. Even though the consummation of the agreement would give practical control of United Artists to the Naifys, as the court observed "the whole may be worth less than a part."

The lower court in determining the fairness of the agreement relied heavily on language of this Court in the case of *Warren v. Balto. Transit Co.,* 220 Md. 478, 483, 154 A. 2d 796 (1959), wherein we indicated that valuation is to be determined: "* * * by appraising all material factors and elements that affect value,

giving to each the weight indicated by the circumstances, including the nature of the business and its operations, its assets and liabilities, its earning capacity, the investment value of its stock, the market value of the stock, the price of stocks of like character, the size of the surplus, the amount and regularity of dividends, future prospects of the industry and of the company, and good will, if any." Therefore fairness is basically a factual determination and the lower court's findings will not be disturbed unless clearly erroneous. Maryland Rule 886 a.

The court below throughout its opinion recognizes the disparity between the financial conditions of the two corporations. It found that "During the past five years, the ratio of United Artists' assets to its current liabilities has been approximately one to one, with only minor fluctuations. [But] California's current assets-liability ratio is almost three to one, a ratio which has been more or less maintained through the five-year period." As to dividends, it was found that United Cal made regular declarations (even though, as noted earlier, it retained a large proportion of its earnings), whereas United Artists had not declared any dividends for several years, with no foreseeable improvement.

The record in this case is very complex in relation to the value of the stock of the two corporations and their assets, liabilities and earnings. The problem stems, we believe, at least in part, from the fact that the several financial experts called as witnesses differed as to which accounting method should be used in the valuation of the items mentioned. The lower court chose to give greater weight to the testimony of those which tended to uphold the fairness of the agreement, pointing out that these individuals were more familiar with the motion picture exhibition business than the others. It found after hearing all the testimony that the Exchange Agreement was fair and in fact favorable to United Artists considering its relatively poor financial condition.

We hold that the test of fairness was properly applied to the Exchange Agreement and that under all the circumstances present the court was correct in finding the agreement fair.

*Decrees affirmed; appellants to pay the costs.*

HORNEY, J., filed the following dissenting opinion, in which McLAUGHLIN, J., specially assigned, concurs.

The majority opinion affirming the decrees of the lower court in the equity cases—brought by Maxwell Cummings and others (the Cummings group) against United Artists Theatre Circuit (United Artists) and Michael Naify and others (the Naify group) to restrain consummation of the stock exchange agreement (whereby the Naify group were assured practical control of United Artists)—notwithstanding the simultaneous order in the mandamus proceeding requiring United Artists to call a special meeting of its stockholders for the purpose of removing directors of the corporation pursuant to the request of the Cummings group (which but for the consummation of the exchange agreement might have been in the majority), seems to be based on the conclusion that control of the corporation was immaterial and that the agreement should stand or fall depending on whether it was fair to the corporation.

While it may be true that the board of directors denied the request for a special meeting of stockholders in good faith, it was error, in my opinion, to refuse the injunctive relief sought by the Cummings group. Cf. *Richman v. DeVal Aerodynamics,* 183 A. 2d 569 (Del. Ch. 1962), where, as here, the request for a special meeting of stockholders was denied because the board of directors was of the opinion that the requisite percentage of shareholders had not made a demand, the request was held to have been wrongfully denied and a mandatory injunction compelling the special meeting was granted. Furthermore, in a subsequent suit to recover counsel fees incurred in the injunction proceedings—see *Richman v. DeVal Aerodynamics,* 185 A. 2d 884 (Del. Ch. 1962)—it was recognized that the injunction issued, aside from compelling the holding of a special stockholders' meeting, prohibited the directors from carrying out any contemplated action which might have proved to be binding on the corporation and which the requesting stockholders apparently thought unwise. Although the facts in these *Richman* cases do not indicate whether or not control of the corporation was involved, or even whether or not the contemplated action of the board was fair to the corporation, the significance of the cases is that the board of directors was enjoined

from taking the action when they knew that the special meeting was requested for the purpose of removing them from office and that the corporate action contemplated was opposed by a group of stockholders.

Although Code (1957), Art. 23, § 38(c), specifically affords the "holders of shares entitled to not less than twenty-five percent of all the votes entitled to be cast," a right to have a special meeting of stockholders called for the purpose, among others specified in § 52(d), of removing "any director or directors from office," the request by the Cummings group for a special meeting was refused by the secretary of the corporation and the board of directors at its next regular meeting approved the exchange agreement the president of the corporation had formulated with the Naify group and passed a formal resolution denying the requested stockholders' meeting. The lower court, though finding that the action of the board was motivated by the fear that the Cummings group might gain control as well as by the belief that consummation of the agreement would serve a legitimate corporate purpose, held that the agreement was fair under the circumstances, and the majority has affirmed this holding.

But regardless of the fairness of the exchange agreement, it seems clear to me that affirmance has the effect of nullifying, if it does not repeal outright, the statutory right of stockholders in a case such as this to call a special meeting for the purpose of removing directors. In affirming, the majority has not cited a single case for the proposition that a board of directors may, in the exercise of good faith under circumstances which appear to be fair to the corporation, shift control by means of stock transactions from one group of stockholders to another before complying with a lawful request for a special meeting to remove directors. In the main, all that the majority has done in this case is to try to distinguish the cases relied on by the Cummings group to entitle them to reversal, often without significant success, and to hold that "where a good corporate purpose" is shown, a shift in control is not only permissible but is proper. On the contrary, there are a number of cases in this and other states which are indicative of what the holding ought to be in a situation such as this case involves. Besides the cases

hereinafter discussed at some length, see *Mortgage Bond Association v. Baker,* 157 Md. 309, 145 Atl. 876 (1929)[1]; *Kullgren v. Navy Gas & Supply Co.,* 135 P. 2d 1007 (Colo. 1943); *Yasik v. Wachtel,* 17 A. 2d 309 (Del. Ch. 1941); *L. E. Fosgate Co. v. Boston Market Terminal Co.,* 175 N.E. 86 (Mass. 1931); *Glenn v. Kittanning Brewing Co.,* 103 Atl. 340 (Pa. 1918); *Trask v. Chase,* 77 Atl. 698 (Me. 1910); *Elliott v. Baker,* 80 N. E. 450 (Mass. 1907); and *Luther v. C. J. Luther Co.,* 94 N. W. 69 (Wis. 1903), all of which, without particular reference to fairness, stand for the principle that where, as here, a material motivating force for the issuance or exchange of stock is the maintenance of control, the transaction should be set aside. Other than this it is questionable whether a transaction such as the one in this case, which results in a shift of control, can ever be said to be within the realm of "carrying out the business of a corporation," particularly when the transaction is consummated after the directors have become aware of a plan to remove them from office and replace them with directors favorable to the stockholders seeking control.

While the ultimate result of the exchange of stock may prove to be beneficial to United Artists, it is apparent that it was the fear of dissolution of United Cal (United California Theatres) if Cummings were in control, and the known intention of Cummings to wage a proxy fight to gain control of United Artists, which motivated the execution of the stock exchange agreement. As a result of the exchange of stock, the Naify group, through their 46% ownership of United Artists stock and United Artists 100% ownership of United Cal stock, not only gained practical control of United Artists but still retained their control over United Cal. The swiftness with which the exchange agreement was executed after the denial of the special meeting of stockholders, the fear the Naify group had of the Cummings group and the resulting advantage to the Naify group, clearly indicate that the primary purpose of the actions of the board in ex-

---

1. There are also two *nisi prius* decisions by the Circuit Court of Baltimore City. See *United Funds v. Carter Products,* published in the *Daily Record* of Sept. 23, 1963, and *Maslin v. Baltimore Radio Show,* filed in Circuit Court No. 2 on Jan. 24, 1934, the latter of which is directly in point.

ecuting the agreement and denying the special meeting, was to shift control of United Artists so as to prevent the Cummings group from gaining the control they sought. The exchange of stock therefore, instead of having *some* effect on the control of the corporation, as the majority has found, had a *total* effect. as to which group was to be the dominating force in United Artists.

Furthermore, despite the effort of the majority to distinguish *Lazar v. Knolls Cooperative*, 130 N. Y. S. 2d 407 (1954), by saying that the board of directors of United Artists was a duly elected board and not an interim one holding office illegally, that the action of the board was not a violation of a by-law of United Artists and that the Maryland statute fixed no time when a special meeting must be held, it is apparent that *Lazar* is directly in point here. For, in that case, the holdings, as they ought to be in this case, were to the effect that the denial of a special stockholders' meeting was improper even though the calling of one might have entailed a delay and consequent injury to the corporation and that stockholders' rights should not have been violated for the sake of speed since it was their fundamental right to have a special meeting called, and not that of the unlawfully constituted board, which was the determinative factor.

For cases not cited by either of the contending groups or by the majority, see *Rowland v. Times Pub. Co.*, 35 So. 2d 399 (Fla. 1948), where an issuance of stock that shifted control after a special meeting of stockholders had been wrongfully denied, was held to be unlawful despite the fact that compliance with a statute concerning the issuance of stock would not have been in the best interests of the corporations; and see *Thwing v. Weibatch Liquid Scale Co.*, 206 N. W. 320 (Mich. 1925), where an issuance of stock was held unlawful even though it was subsequently voted in the best interests of the corporation.

In this case, where there was no showing that the stockholders, had they been given an opportunity to do so, would have removed the incumbent directors and replaced them with a Cummings related board, where there was no showing that the

exchange agreement would not have been approved had a new board of directors been placed in office before the agreement was consummated, and particularly where there is a serious question as to whether the shift in control was a "carrying out" of the ordinary business affairs of the corporation, the requesting stockholders should not have been deprived of their absolute right to have a meeting called and held before the exchange agreement was finally consummated. For, by allowing a well-nigh irreversible shift in control to stand without having given the stockholders an opportunity to even attempt to remove the unwanted directors, the provisions of Art. 23, § 38(c) and § 52(d) were thereby rendered absolutely nugatory so far as the Cummings group was concerned. This should not have been permitted. See *Weisblum v. Li Falco Mfg. Co.*, 84 N. Y. S. 2d 162 (1947), where the Court, in stating that it would be improper for it to assume that the action taken at a special meeting would be against the best interests of the corporation and thereby deprive the requesting stockholders of their lawful rights, held that the request for a special meeting of stockholders was proper and that the refusal to call the meeting was improper despite the belief of the board of directors that the meeting would have a detrimental effect on the corporation.

If what the lower court decreed is to be the law of this State, as the majority has said it is, the opinion leaves open the vital question as to what force Art. 23, § 38(c) still has, if any. Not to have answered this question makes it possible for the board of directors of any corporation, having its own shares or the shares of affiliated corporations at its disposal, to perpetuate itself in office indefinitely by merely denying a request for a special meeting of stockholders and then, by some sort of stock transaction, either retain control or shift it to a friendly group. This ought not to be possible and in fact is exactly what this Court said in *Mortgage Bond Association v. Baker, supra* (at p. 320 of 157 Md.), would not be tolerated. As the legislature undoubtedly intended, it is the rights of stockholders that should be protected and the courts should not allow directors to infringe upon these rights under any circumstance when they are aware of a lawful plan to remove them from office under § 52(d). Cf. *Rolling Inn, Inc. v. Iula*, 212 Md. 596, 130 A. 2d

758 (1957) ; *Moore v. Linahan,* 117 F. 2d 140 (C. C. A. 2d 1941), *cert. den. sub nom. Sargent & Co. v. Moore,* 314 U. S. 628 (1941).

In my opinion the decrees of the lower court should be reversed and remanded for further proceedings.

Judge McLaughlin authorizes me to say that he concurs in the views herein expressed.