## DEVEREUX ET AL. *v.* BERGER

[No. 472, September Term, 1970.]

*Decided December 15, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Sheldon P. Schuman,* with whom were *Koepenick, Patterson & Schuman* on the brief, for appellants.

*Stanley J. Marcuss,* with whom was *Murray Deutchman* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

In this appeal, the principal question presented to us is whether the Circuit Court for Montgomery County (Shook, J.) erred in concluding that the appellant, C. Kemp Devereux, as president, chief executive officer, controlling stockholder and a director of both Metropolitan Acceptance Corporation (MAC) and Blair's Television & Music Company (Blair's), was guilty of gross negligence, culpable mismanagement and waste of corporate assets in discharging his duties to MAC and had engaged in a course of conduct to advance his own personal interests and the interest of Blair's at the expense of MAC.

Various aspects of this controversy have previously been before us.

In *Metropolitan Acceptance Corporation v. Irving D. Berger,* No. 204, Sept. Term, 1967, involving Law No. 19680 in the Circuit Court for Montgomery County in which Berger, the plaintiff in that case, had obtained on March 16, 1967, a summary judgment against MAC in the amount of $72,501.53, with interest from March 16, 1967, and costs, we dismissed the appeal on August 22, 1967. A second appeal, No. 38, Sept. Term, 1968, in the

same law action, from an order of February 9, 1968, overruling MAC's motion to set aside a prior order for supplementary proceedings, was dismissed by us on June 26, 1968.

In *Devereux v. Berger,* 253 Md. 264, 252 A. 2d 469 (1969), we affirmed an order of the Circuit Court for Montgomery County, holding Devereux guilty of contempt by violating the terms of an interlocutory injunction passed November 4, 1966, restraining MAC and Devereux as its president and their agents, servants, employees, attorneys, successors and assigns from, *inter alia,* any liquidation, dissipation or dissolution of MAC and from engaging in any course of conduct designed to impair, diminish or destroy the present assets of the corporation. Devereux was required to pay $600.00 to purge himself of the contempt.

The action involved in the present appeal is Equity No. 34236. The bill of complaint was filed on December 6, 1967, by Berger, the appellee, for himself and for all common stockholders of MAC against MAC, Devereux and Blair's. The prayers for relief were that (1) Devereux be required to reimburse MAC for all losses sustained by the evidence up to $150,000.00; (2) Devereux account to MAC for the entire financial injury caused by his "breach of trust and gross negligence in discharging his duties as president and director of MAC"; (3) Devereux and Blair's be required to reimburse MAC for all losses sustained by the evidence up to $150,000.00; (4) Devereux and Blair's be required to account to MAC for the property of MAC conveyed to or appropriated by Blair's "in bad faith, without sufficient consideration or authority and in fraud of plaintiff"; (5) the promissory note made by Blair's on or about October 31, 1965, to the order of MAC for $40,000.00 be annulled; (6) Blair's be required to pay MAC or the plaintiff the sum of $40,-000.00; and (7) the plaintiff have other and further relief.

After several legal skirmishes, taking of depositions

and filing interrogatories, exceptions, orders, etc., the case came on for a hearing on its merits on August 3, 1970, before Judge Shook, testimony being taken for three days. The testimony and documentary exhibits indicated the following:

Devereux at all of the times involved in this appeal was the president and chief executive officer of both MAC and Blair's, as well as a director and controlling stockholder of both corporations. Blair's was engaged in selling various types of appliances at retail.

MAC was organized as a Maryland corporation on September 20, 1960, for the purpose of buying commercial paper in the nature of installment sales contracts from retail appliance dealers. When MAC was formed, it was contemplated that a substantial portion of its purchases of commercial paper would be from six of its original directors who operated retail appliance stores.

For the first full year of operations, 1960-61, MAC purchased installment sales contracts of approximately $63,655.00. For the following years through 1964, its purchases were approximately: 1962—$73,037; 1963—$65,544; 1964—$60,425. MAC, however, by early 1966 had practically ceased operations.

In 1963, MAC wished to make a public offering of 150,-000 shares of its stock from which it hoped to gross $525,000.00 and net $453,000.00. To accomplish this, MAC prepared a prospectus and filed it with the Securities and Exchange Commission. Devereux, however, was not able to interest any underwriters in the proposed offering and in July, 1963, withdrew the registration statement.

Shortly after the proposed public offering failed, the attorney for MAC (and its then secretary) suggested to Devereux that private money might be available and suggested a person who might be willing to lend MAC some money. As a result, Devereux communicated with Berger and on March 3, 1964, obtained a loan from him for MAC in the amount of $60,000, payable in five years, with interest at 12% per annum.

The interest on the note was payable quarterly. At any time after the second anniversary of the note, either the maker or the holder had the right to prepay or to require prepayment, provided written notice of 90 days was given to the other party. In the event of default, the holder, at his option, could accelerate the entire balance due including a reasonable attorney's fee and other reasonable costs of collection. Devereux added a hand written notation that he guaranteed payment for 90 days from the date of the note and that during this period the provisions of paragraph 9 (a) (3) of the Security Agreement were waived.

The Security Agreement referred to was between Berger and MAC and was taken by Berger as security for the $60,000 note. After certain recitals and warranties, by the respective parties, it was agreed that Berger (referred to as "Factor" in the Security Agreement) should have a continuing security interest, pursuant to the Uniform Commercial Code (Code, 1964 Repl. Vol.) Art. 95B, §§ 9-101-507 upon the described collateral and to all of such collateral (with proceeds therefrom) which may from time to time come into MAC's possession, described as all chattel paper (as defined by the UCC), accounts receivable, contract rights, notes, installment payment obligations and other obligations for the payment of money created or acquired by MAC, created or arising out of the loan of money by MAC, or rendering of services by it in its regular course of business. The continuing security interest was subordinated only to the security interest of banks which had loaned or were loaning money to MAC to the extent of the amount outstanding on such indebtedness. MAC further agreed that the face value of the collateral should exceed by at least $100,000 the then total outstanding bank loans to which the loan was subordinated. MAC further agreed to furnish, on or before the fifteenth day of each month, a statement listing, as of the end of the preceding month, the collateral held by it at its then face value. There were a number of provisions of remedies in the event of a default. As part

of the transaction, Berger also obtained a written option contract whereby he had the irrevocable option for two years to purchase 60,000 shares of MAC common stock at $1 per share.

MAC defaulted on this loan and Berger filed an action against MAC to recover on the Berger note. Berger recovered judgment for $72,501.53 on March 16, 1967, which became final after our dismissal of the appeal from that judgment, as we have already stated. MAC never paid the Berger judgment.

On November 8, 1967, Berger, by letter, made demand on Devereux as president and as a director of MAC to conduct an investigation into whether MAC's inability to meet its financial obligations resulted from a depletion of the corporation's assets or the impairment of its business caused by the misconduct of any officer or director. Devereux not having replied to the letter and not having taken any action in response to it, Berger then filed the present suit in equity on his own behalf and on behalf of all of the common stockholders of MAC.

The trial court in a carefully considered memorandum opinion made a number of findings of fact and concluded that Devereux was guilty of gross mismanagement, gross negligence and of a waste of corporate assets in discharging his duties as president and director of MAC; that he had engaged in a course of conduct, the purpose of which was to advance, at the expense of MAC, his own personal interests and those of Blair's and that Blair's through its president, Devereux, had engaged in a course of conduct, the purpose of which was to advance at the expense of MAC its own interests and those of its president, Devereux. The lower court entered a decree on October 14, 1970, in favor of Berger, on behalf of MAC, for $83,666.35 against both Devereux and Blair's, jointly and severally, with interest at 6% per annum from date, rescinded a $40,000 note transaction of October 31, 1965, authorized Berger to execute upon the decree in the name of MAC and to satisfy Berger's

obligation as a judgment creditor of MAC out of the funds obtained from the enforcement of the monetary decree, and provided that any balance remaining after deducting the amount of the Berger judgment and expenses, including reasonable attorney's fee incurred on behalf of MAC in enforcing the decree, be paid to MAC, and required Devereux and Blair's to pay the costs.

The evidence at the hearing indicated the following:

Devereux, almost as soon as the $60,000 proceeds from the Berger loan had been received by MAC, used approximately $30,000—one half of the proceeds of the loan—to have MAC pay off a $30,000 note with Suburban Trust Company, even though that note provided for interest at 6% per annum and was not yet due. Approximately a month later, Devereux caused MAC to pay off the Bank of Bethesda another 6% loan of $2,000. Both of these payments were without prior corporate approval. The effect of these note payments was that Devereux used money borrowed at 12% to pay loans borrowed at 6%. Devereux explained that the prepayment of the 6% bank loans was necessary in order to regain the collateral that secured those loans, the face amount of the loans being approximately 70% of the value of the commercial paper collateral pledged to secure the loans.

During the period, May through August, 1964, Devereux caused MAC to transfer to Blair's $23,725 in cash in exchange for trust receipts. The interest rate MAC charged Blair's on the $23,725 was 9% per annum.

As of October 31, 1965, Blair's owed MAC $47,002.75. No steps were taken to collect that debt notwithstanding MAC's need for cash to purchase commercial paper. Devereux negotiated, on behalf of MAC as its president and on behalf of Blair's as its president, an arrangement whereby MAC accepted a $40,000 non-interest bearing note in lieu of the amount Blair's owed MAC. This note was originally drafted by Devereux. When some of the MAC directors and stockholders complained in December of 1965 about the $40,000 note, the note was changed to

provide for interest, but only at the rate of 6% per annum. Devereux was unable to produce the original $40,-000 note and testified that he did not know where it was.

The $40,000 note was to be repaid at the rate of $125 a week. At the same time, however, MAC was to pay Blair's an administrative fee of $150 a week ($7,800 a year later mentioned in this opinion), so that, in addition to the loss of some $7,000 by MAC in the $40,000 note transaction, MAC was to pay Blair's a net amount of $25 a week—$150 weekly administrative fee less $125 weekly note repayment. By May, 1966, the $40,000 note had only been reduced by $500, leaving a balance due of $39,500.

On December 31, 1965, MAC's seven directors were reduced to three, who were then Devereux, Margot Loys, his secretary, and Dorothy Payette, his mother-in-law. The then legal counsel for MAC resigned on January 5, 1966. Prior to these changes, no corporate authorization was sought or given for the $40,000 note transaction or for certain administrative fees charged MAC.

Prior to the Berger loan, MAC had never paid Blair's any administrative fees. On March 10, 1964, however,—some seven days after the execution of the Berger note —MAC paid Blair's $2,500 for administrative services. On March 31, 1964, an additional $600 was paid by MAC to Blair's as an administrative fee. As a fee for administrative services in prior years, MAC paid Blair's $3,500 on May 31, 1964. The following year—on August 31, 1965, MAC set up an account payable to Blair's in the amount of $12,614.89 for administrative services. In 1966 and 1967 Blair's charged MAC for administrative fees in the amount of $7,800 for each of those years. Devereux testified that these administrative fees were charged to compensate Blair's for expenses. MAC, however, owned most of its own equipment and paid its own operating expenses, which amounted to approximately $19,000 in 1965, $15,000 in 1966 and $15,000 in 1967, including the expense for clerical help needed to operate

its business. No approval of directors or stockholders was given for the payment of these administrative fees. MAC had ceased its acquisition of commercial paper from sources other than Blair's in 1964 and had ceased buying commercial paper altogether by the end of 1965.

Devereux caused Carte Blanche charges, travel and other expenses in the amount of $2,719.29 to be charged to MAC without providing substantiation for these charges. He also charged to MAC the $600 contempt fine, previously mentioned, which he had been ordered to pay personally.

Devereux also caused MAC to make personal loans to various employees of Blair's and to several of his relatives and acquaintances. The total amount of these loans was $7,507.61 of which $3,734.11 was never repaid.

There was also evidence that Devereux had caused the assets of MAC to be commingled with his own and with those of Blair's and to be kept under the control of Blair's. An inspection of MAC's books in December, 1965, indicated that there was a shortage of approximately $12,000 in commercial paper which had been reported as owned by MAC. The absence of this commercial paper was not explained.

The trial court concluded from its findings of fact, the following:

1. The payments made by Devereux to Suburban Trust Company and to the Bank of Bethesda of their 6% notes from money borrowed at the interest rate of 12% per annum was a result of bad judgment and not of gross negligence or gross mismanagement so that Devereux was not liable for any losses resulting from those payments.

2. The losses of $3,734.11 loaned to individuals and never repaid, the loss of approximately $12,000 in notes missing and not accounted for, the $2,719.29 in travel, Carte Blanche charges and other expenses, and the loss resulting from the inability to use the $7,000 Devereux kept in the safe deposit box registered in his own name

were also the result of bad judgment and not of gross negligence or gross mismanagement. Devereux was not held to be liable for those amounts.

3. Devereux, however, was guilty of gross negligence and gross mismanagement as president and director of MAC and had engaged in a course of conduct to advance, at the expense of MAC, his own interests and the interest of Blair's, and Blair's had through its president, Devereux, engaged in a course of conduct to advance its own interests and those of Devereux by which MAC had lost:

a. The principal amount of $47,002.75 being the amount Blair's owed MAC as of October 31, 1965, the trial court's finding that the arrangement whereby MAC accepted the $40,000 note from Blair's was a wash transaction, Blair's being obligated to repay the note at the rate of $125 a week but MAC being obligated to pay Blair's $150 a week as an administrative fee or a net payment a week by MAC to Blair's of $25. The lower court concluded, however, that interest at the rate of 22% per annum, contended for by MAC that it could have earned on this money, was too speculative and that interest at the rate of 12% per annum was properly allowed.

b. The amounts paid by MAC to Blair's for administrative services over and above the reasonable amount of $500 a year, the trial court finding that amounts over $500 a year were excessive.

4. Devereux, as an officer and director of MAC, owed duties of loyalty and care to it and these required him to use his best abilities and to discharge faithfully his obligations as such president and director and he had no right to prefer his own interests or those of Blair's over those of MAC and had a duty to disqualify himself when situations of conflict arose as they did. Devereux, having been found guilty of gross mismanagement and gross negligence in discharge of the duties already mentioned

by the trial court, is personally liable for the losses sustained by MAC along with Blair's.

As we have already indicated, the lower court signed a decree on October 14, 1970, which, *inter alia,* awarded a monetary judgment against Devereux and Blair's, jointly and severally, in the amount of $83,666.35. The decree sets out the method of computing this amount as follows:

"$47,002.75 + $27,261.60 (12% interest per annum from 10/31/65) = $74,264.35

$ 2,500.00
3,500.00
6,902.00
_____
*12,902.00
**less 3,500.00
_____
9,402.00          9,402.00
_____
$83,666.35"

The appellants, Devereux and Blair's, make three contentions before us:

1. That a secured creditor who is, in effect, a *de facto* stockholder with the power to destroy a company is barred by public policy from bringing the equity suit in the present case.

2. The lower court has erroneously substituted its judgment for that of the persons lawfully in control of MAC's affairs.

3. The lower court erred in calculating the amount of the damages.

We will now consider these three contentions in the order indicated.

---

* This is the total of the payments of administrative fees.
** This $3,500 represents the allowance of a reasonable charge of $500 for administrative services for a seven-year period.

## 1.

There are at least two reasons why Devereux's contention that, as a *de facto* stockholder with power to destroy MAC, Berger is barred by public policy from bringing the equity suit involved in the present case is wrong.

The first reason is that the evidence does not support the contention that Berger was a *de facto* stockholder of MAC or that he had the power "to destroy" MAC.

Berger did have an *option* to purchase 60,000 shares of MAC stock at $1 a share, but the option agreement did not give Berger any rights of a stockholder before he exercised the stock option and acquired the 60,000 shares. He did not exercise the option and never attempted to assert, so far as the record discloses, any rights of a stockholder in MAC.

Nor does the record support the suggestion by Devereux that Berger had a "dominant position" in regard to MAC. Devereux, as president of MAC, solicited the Berger loan and there is no evidence to indicate that the making of the Berger loan to MAC was not an arms-length transaction. There was a two-year period during which Berger had no right to require prepayment by MAC. The evidence is clear, and the trial court so found, that Devereux was the dominant and controlling person so far as MAC was concerned.

The second reason is that this contention was not raised below either in the pleadings or in the evidence and was not directly passed upon by the trial court. The point was not preserved for appellate review. Maryland Rule 885.

## 2.

In our opinion, the trial court did not attempt to substitute its judgment for that of the persons lawfully in control of MAC's affairs. It is, of course, "well established that courts generally will not interfere with the internal management of a corporation" and that the "conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of

the board properly exercises its business judgment, the directors are not ordinarily liable." *Parish v. Maryland and Virginia Milk Producers Association,* 250 Md. 24, 74, 242 A. 2d 512, 540 (1968). On the other hand, as we observed later in the *Parish* opinion:

> "This sound general rule, however, is subject to the important exception that directors *will be held liable* if they permit the funds of the corporation or the corporate property to be lost or wasted by their gross or culpable negligence." (Emphasis in the original opinion.)
> (250 Md. at 74, 242 A. 2d at 540.)

We reviewed the prior cases of this Court, as well as certain English authorities and federal cases in *Parish,* citing with approval a summary of the Maryland law in regard to the question of liability of directors in Brune, *Maryland Corporate Law and Practice,* Rev. Ed. 1953, Sec. 226, page 225.

The question of whether the conduct of Devereux, as president and a director of MAC, was the exercise of poor business judgment or whether there was gross negligence or gross mismanagement and a waste of corporate assets was directly presented to the trial court. As we have seen, the trial court separated the conduct resulting in loss from bad business judgment and conduct resulting in loss from gross negligence, gross mismanagement and the waste of corporate assets. The trial court stated in its memorandum opinion:

> "The Court is well aware that it is not its function to attempt to substitute its judgment for that of the persons who are lawfully in control of a corporation's affairs. The Maryland law is summarized in Brune, *Maryland Corporate Law and Practice,* Rev. Ed. 1953, Sec. 226, page 225, as follows:
>
> > " 'In addition to the specific statutory liabilities and penalties just outlined, a direc-

tor may, of course, be liable to the corporation or its receiver for the consequences of breach of his fiduciary duties. Thus, it is said that directors are liable for "gross and culpable negligence" in the discharge or omission of their duties.'

"As stated in 3 Fletcher, *Corporations,* Sec. 1048, page 639:

"'Directors are also liable if they suffer the funds of the corporation or its property to be lost or wasted by gross negligence and inattention to the duties of trust.'

"The Court having found that Defendant Devereux was guilty of gross negligence, waste of corporate assets and culpable mismanagement, he will, therefore, be found liable for the damages suffered by MAC."

Indeed, in several instances, the trial court held certain conduct by Devereux to have been bad business judgment, rather than gross negligence or gross mismanagement, which might well have been the latter. For example, the lending of MAC's funds to relatives, acquaintances and other individuals who apparently had no connection with MAC's business or with the advancement of its affairs; the keeping of MAC's cash in Devereux's personal safe deposit box; and the $12,000 shortage in commercial paper reportedly owned by MAC might well be said to have been the result of gross negligence and gross mismanagement rather than the result of bad business judgment as the trial court held. However, it is not necessary for us to pass upon these matters inasmuch as Berger did not file a cross-appeal. See *Temple Hill Baptist Church, Inc. v. Dodson,* 259 Md. 515, 521, 270 A. 2d 802, 806 (1970) ; 5 Am. Jur. 2d *Appeal and Error* § 707, pp. 152-54.

The conduct which the trial court found to be the re-

sult of gross negligence, gross mismanagement and which was intended to, and did, benefit Devereux and Blair's at the expense of MAC, as above set forth, was properly so held by the lower court and Devereux and Blair's are liable for losses resulting to MAC from such conduct.

### 3.

Devereux finally contends that, in any event, the lower court erred in calculating the amount of the damages set forth in the monetary decree.

Devereux complains of the trial court's allowance of the amount of $47,002.75 plus interest at 12% per annum amounting to $27,261.60, or a total of $74,264.35. His first contention is that the giving by Blair's of the $40,000 note to MAC "was merely a written confirmation of an existing situation" and that MAC suffered no loss as a result of the transaction. He further contends that the rescission of the $40,000 note by the decree, in effect, restores the *status quo* and it will unjustly enrich Berger to hold Devereux responsible for the $47,002.75 item. We do not agree with these contentions.

Implicit in the finding by the trial court that the giving of the $40,000 note and the provision for the $150 weekly payment by MAC to Blair's for administrative services with a $125 weekly payment of the $40,000 note to MAC by Blair's was a "wash transaction," is that this transaction was designed to prevent MAC from collecting the $47,002.75 amount due MAC by Blair's at a time when MAC badly needed cash for the successful operation of its business. It is a reasonable inference from this that Blair's could have been required to pay MAC the $47,002.75 but for the note arrangement and that MAC lost this amount as a result of the note arrangement. The amount of $47,002.75 was therefore properly allowable against Devereux personally as well as against Blair's.

The testimony was rather clear that if MAC had the necessary money to purchase installment contract paper —which was available in ample quantities—MAC would

have made a profit of 22% per annum on such purchases. Indeed, Devereux, himself, so testified. The lower court was of the opinion that 22% was too speculative and too contingent on uncertain factors to use as the interest rate in the decree on the $47,002.75 item. The trial court used the interest rate of 12% per annum, most likely on the theory that, since MAC paid 12% per annum to Berger on his loan, this rate was appropriate for use in the decree. It may well be that a 22% interest rate could have been sustained as Berger earnestly contends, but this possible issue is not before us, in the absence of a cross-appeal, and it is unnecessary for us to pass upon it. The 12% rate was a most reasonable rate based upon the cost of money to MAC at or about the time. Its allowance was probably more favorable to Devereux than he was entitled to, but obviously, he cannot be heard to complain of that.

Devereux also complains in regard to the inclusion of the item of $6,902 for prior "administrative fees", contending that this amount had already been adjusted in the $40,000 note transaction and that, in effect, he is being "charged twice" for that amount. We do not see it that way. The $40,000 note transaction is rescinded by the decree and the original $47,002.75 obligation and liability for it was restored, regardless of the "adjustment" of $6,902.00 for past "administrative fees" which the trial court found to have been improperly and wrongfully charged. This amount, together with the other charges of $2,500 and $3,500 for "administrative fees," was properly charged against Devereux and Blair's in the decree, less the item of $3,500 representing a proper allowance of $500 per annum for seven years for administrative services.

Devereux finally contends that the $500 annual allowance for administrative services is purely speculative and pulled "out of the hat" by the lower court. We do not agree with this contention. The lower court had before it evidence in regard to the amount of time spent on MAC's

affairs by Blair's employees and had before it the accountant's testimony that for the year 1965 the books of Blair's indicated a total of $1,200 in administrative-type expenses which might properly be allocated between Blair's and MAC. We cannot say that the trial court erred in making an allocation of $500 as a reasonable annual amount which MAC should bear for administrative services. Here again, Berger contends that there should have been no allocation at all; but this issue is not before us in the absence of a cross-appeal. Here also, if the ruling was more favorable to Devereux than he was entitled to, he cannot be heard to object to it.

Finding no error by the lower court, we shall affirm the decree of October 14, 1970.

*Decree of October 14, 1970, affirmed, the costs to be paid by the appellants.*