**MARTIN MARIETTA CORPORATION**

v.

**The BENDIX CORPORATION.**

**Civ. No. Y–82–2560.**

United States District Court,
D. Maryland.

Sept. 22, 1982.

Alexander Sussman and Marc Cherno, New York City, and John H. Lewin, Jr. and Benson E. Legg, Baltimore, Md., counterclaim plaintiff Bendix.

George Beall and James R. Eyler, Baltimore, Md., counterclaim defendant Martin Marietta.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

This Court is once again called to rule on a matter arising out of the Bendix-Martin Marietta-United Technologies tender offer contest. The instant motion, brought by counter-claimant, The Bendix Corporation ("Bendix"), seeks a preliminary injunction against the tender offer of Martin Marietta Corporation ("Marietta"), a Maryland corporation, for majority ownership of Bendix. Bendix alleges that the offer is manipulative and does not provide for full and fair disclosure to Bendix' shareholders in violation of the Williams Act. Bendix further argues that the offer is contrary to the interests of Marietta's stockholders in violation of the Maryland common law of fiduciary duty.

## THE THREE TENDER OFFERS

On September 17, 1982, pursuant to its tender offer announced August 25, Bendix purchased approximately 52.7% of Marietta common stock at a price of $48 per share. When this purchase is added to its pretender offer purchases of common stock,[1] Bendix owns over 58% of common stock and is in the process of buying additional shares on a first-come, first-served basis with the aim of increasing its controlling interest to 70% within a few days. Once these current purchases are completed, Bendix intends to acquire all of the remaining shares through a squeeze-out merger whereby the remaining shareholders would receive .82 of a share of Bendix common stock for each share of Marietta common stock.[2]

On August 30, five days after Bendix announced its tender offer, Marietta countered with a tender offer for approximately 50.3% of Bendix' common stock at a price of $75 per share.[3] If Marietta succeeds with its tender offer, it intends to acquire all of the Bendix shares not tendered to it through a squeeze-out merger whereby the remaining Bendix shareholders would receive 1⅔ Marietta shares for each Bendix share. The withdrawal deadline for Marietta's offer is midnight September 22—*i.e.,* at that time Bendix shareholders who tendered their stock may no longer take back their stock and Marietta may proceed to purchase the stock tendered to it.

As if these concurrent tender offers didn't provide enough liveliness, United Technologies Corporation ("United") jumped into the fray on September 7 with its tender offer for 50.3% of Bendix common stock at a price of $75 per share. On September 15, United increased its offer to $85 per share. The withdrawal deadline of United's offer is midnight September 28.

With United assuming the role of a cheerleader for Marietta, Bendix and Marietta have engaged in a fierce PAC–MAN ("I'll eat you before you eat me") struggle. Both Bendix and Marietta have amended, or are trying to amend, their corporate by-laws to make it more difficult for their adversaries to acquire them. The management of both corporations have issued a flurry of press releases, not to speak of the memoranda filed in this Court, designed to put themselves in a favorable light and make their opponents appear to be ruthless egotists Bendix has even gone to the considerable lengths of holding a "Bendix Unity Day" on September 20 at several of its plants around the country where Bendix workers attended pep rallies with high school bands, local politicians, union officials, and balloons. On September 21, this

---

1. From April 12, 1982 to July 29, 1982, Bendix purchased just under 5% of Martin Marietta's common stock. By limiting its purchases to less than 5%, Bendix did not have to comply with the disclosure requirements of the Williams Act. 15 U.S.C. § 78n(d)(1).

2. Bendix has not guaranteed any minimum amount of consideration for the second step of its offer. At page 3 of its Offer to Purchase, Bendix expressly stated it "reserves the right to modify its present intention with respect" to the second step of its offer.

3. The proration period of Marietta's tender offer expired at midnight September 9. By that time approximately 75% of Bendix' common stock had been tendered to Marietta.

series of offers, referred to in the media as a three-ring circus, had expanded to seven rings with ongoing performances in two federal courts in New York, two state courts in Delaware, and a state and federal court in Michigan.

PRELIMINARY INJUNCTION STANDARD

So far as this Court is aware, the preliminary injunction standard in the Fourth Circuit has not changed since this Court's opinion six days ago denying Marietta's request for a preliminary injunction against Bendix' tender offer. *Martin Marietta Corp. v. The Bendix Corp.,* Civ. No. Y–82–2560 (Slip Opinion, September 16, 1982). That opinion noted that the Fourth Circuit has established a four-part standard governing preliminary injunctions. The standard is set forth in *North Carolina State Ports v. Dart Containerline,* 592 F.2d 749, 750 (4th Cir. 1979):

> [I]n this circuit the trial court standard for interlocutory relief is the balance-of-hardship test. Four factors enter into the determination of whether to grant or withhold interim relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest.

*The North Carolina State Ports* court also addressed the appropriate weight to be given to these four factors:

> There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented.

BALANCE OF HARDSHIP

As this Court said in a different context, "[b]alancing the hardships in this case produces no clear-cut winner or loser and reveals only that both sides can be perceived to have a great deal of interest at stake in the outcome over preliminary relief." *Love v. Hidalgo,* 508 F.Supp. 177, 183 (1981). Now that Bendix has succeeded in its offer to purchase a majority of Marietta's common stock, it is clear that any action taken by this Court would significantly aid one combatant and significantly injure the other combatant in their mutually exclusive goals of taking over one another. Since the balance of hardship does not favor either Bendix or Marietta, the inquiry into the likelihood of success on the merits of Bendix' claims assumes paramount importance. The Williams Act and Maryland common law claims will be considered in order.

WILLIAMS ACT: INTRODUCTION

Bendix' claims draw two provisions of the federal securities statutes into question. Central to the dispute is Section 14(e) of the Williams Act, which provides:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer.

15 U.S.C. § 78n(e). Bendix claims that Marietta has "engaged in manipulative practices," has made "untrue statement[s] of material fact," and has failed "to state . . . material fact[s] necessary in order to make the statements made . . . not misleading." The alleged misstatements and omissions are also said to run afoul of Section 14(d) which, by incorporating 13(d) by reference, requires an offeror to disclose the following information:

... if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure.

## WILLIAMS ACT: MANIPULATION CLAIMS

Bendix argues that two discrete Marietta activities constitute manipulation in connection with a tender offer. First, Bendix claims that Marietta's offer was deliberately designed to inhibit the Bendix tender offer. Bendix then asserts that the "front-end loaded" nature of Marietta's "two step" takeover proposal manipulates the target shareholders of the present Marietta offer. In other words, Marietta is accused of manipulation in connection with both the Bendix and Marietta offers. The reasons why each of these arguments fail will be discussed in turn.

Bendix' manipulation arguments in connection with the original Bendix offer can be subdivided into two components. Bendix first asserts that the "scorched earth" prospect of the Marietta counter offer inhibited the Bendix offer before Bendix purchased the Marietta stock. Bendix then maintains that a successful "scorched earth" offer would effectively nullify the now completed Bendix offer because it would divest Bendix of the financial benefits of the Bendix offer.[4] While Bendix blends and melds these two arguments in its discussion of case law, proper consideration of those authorities and resolution of the issues requires that the two components be kept analytically distinct.

■ The second of these contentions can be easily disposed of. The Williams Act in

general and Section 14(e) in particular does not give an offeror any rights to the "fruits" of its tender offer. *Piper v. Chris-Craft Industries,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Since the *Piper* decision is essential to any Section 14(e) analysis, it should be examined in some detail. In *Piper,* a defeated offeror sued both the target and the successful competing "white knight" for damages for an alleged Section 14(e) violation. A majority of the Supreme Court held that the Williams Act did not provide a private cause of action for the offeror. While the Court expressly withheld opinion on whether an offeror could ever have standing to seek injunctive relief under Section 14(e), *Id.* at 47, n. 33, 97 S.Ct. at 952, n. 33, its exhaustive and unequivocal interpretation of the congressional purpose behind Section 14(e) is dispositive of Bendix' "fruits of victory" argument pressed here. Devoting eleven pages to a painstaking analysis of the relevant legislation, the Court repeatedly stressed that Section 14(e) was limited to the protection of the target's shareholders and did not confer any substantive rights upon the offeror. *Id.* at 26–37, 97 S.Ct. at 941–947. For example, the Court stated:

> Congress was indeed committed to a policy of neutrality in contests for control, but its policy of evenhandedness does not go either to the purpose of the legislation or to whether a private cause of action is implicit in the statute. Neutrality is, rather, but one characteristic of legislation directed toward a different purpose—the protection of investors.... [w]hat Congress had in mind was the protection of shareholders, the "pawn[s] in a form of industrial warfare." ... This express policy of neutrality scarcely suggests an intent to confer highly important, new rights upon the class of participants whose activities prompted the legislation in the first instance.

---

4. Bendix further argues that both its shareholders and Marietta's shareholders would also be "divested" of the "financial benefits of the Bendix Offer." These contentions add nothing to Bendix' arguments. As will be discussed below, Marietta's alleged manipulations are not proscribed by Section 14(e). Section 14(e) is solely concerned with disclosure, yet Bendix is asking the Court to regulate the substantive fairness of Marietta's actions. This is something the Court cannot do.

*Id.* at 29–30, 97 S.Ct. at 943–944. Following this language, this Court must hold that any "scorched earth" plan Marietta may have does not violate Section 14(e) to the extent that the plan divests Bendix of any financial benefits or thwarts Bendix' attempt to translate its completed tender offer into a successful takeover.

Equally unpersuasive is Bendix' argument that the "scorched earth" offer interfered with the events leading up to the consummation of the Bendix' offer on September 17, 1982. To begin with, the point is moot: the Marietta offer did not thwart completion of the Bendix offer. This Court strongly believes that if the counter offer had really hindered the Bendix offer, Bendix certainly would have approached the Court *before* it purchased over 50% of Marietta stock.

■ More importantly, Bendix would not prevail even if the issue were not moot. Once again, *Piper* is clearly on point. The eleven pages of the legislative interpretation cited earlier repeatedly stressed that Section 14(e) is solely a disclosure provision. Congress has not authorized the federal judiciary to scrutinize the substantive fairness of tender offers as long as adequate disclosure is made. *Id.* at 26–37, 97 S.Ct. at 941–947. An illustrative comment of the Court is:

> The sponsors of this legislation were plainly sensitive to the suggestion that the measure would favor one side or the other in control contests; however, they made it clear that the legislation was designed solely to get needed information to the investor, the constant focal point of the committee hearings. Senator Williams articulated this singleness of purpose, even while advocating neutrality:
>
>> 'We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids. S. 510 is designed solely to require full and fair disclosure for the benefit of investors.' 113 Cong.Rec. 24664 (1967).

*Id.* at 30–31, 97 S.Ct. at 943–944. This Court cannot substitute its reading of congressional purpose for the Supreme Court's, and must hold that any "scorched earth" tender offer is "manipulative" under Section 14(e) only if misrepresentations or omissions have been made about it. In short, there is no "manipulation" analysis separate from the disclosure analysis to be undertaken later in this opinion.

This Court is not alone in this view of Section 14(e). The Second Circuit recently stated:

> The complaint was properly dismissed. Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), has as its "sole purpose" the "protection of investors who are confronted with a tender offer." *Piper Industries, Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). It is designed "to ensure that [investors] will not be required to respond [to a tender offer] without adequate information." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). Accordingly, one element of a cause of action under § 14(e) is a showing "that there was misrepresentation upon which the target corporation shareholders relied." *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

*Lewis v. McGraw,* 619 F.2d 192, 195 (2nd Cir.1980). The Seventh Circuit agrees that a misrepresentation is a necessary element of any Section 14(e) violation. *Panter v. Marshall Field Co.,* 646 F.2d 271, 283 (7th Cir.1981). Most importantly, the Supreme Court has very narrowly construed the term "manipulation" in the companion Section 10(b):

> Section 10(b)'s general prohibition of practices deemed by the SEC to be "manipulative"—in this technical sense of artificially affecting market activity in order to mislead investors—is fully consistent with the fundamental purpose of the 1934 Act " 'to substitute a philosophy of full disclosure for the philosophy of *caveat* emptor ....' " *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151 [92 S.Ct. 1456, 1470, 31 L.Ed.2d 741]

(1972), quoting *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186 [84 S.Ct. 275, 279, 11 L.Ed.2d 237] (1963). Indeed, nondisclosure is usually essential to the success of a manipulative scheme. 3 Loss, *supra,* at 1565. No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this "term of art" if it had meant to bring within the scope of § 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary.

*Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476–77, 97 S.Ct. 1292, 1302–1303, 51 L.Ed.2d 480 (1977). Any doubt that this language might be construed to allow "manipulation" to encompass actions not involving deception should be gravely considered in light of the sentence immediately preceding the passage just quoted:

> But the cases do not support the proposition, adopted by the Court of Appeals below and urged by respondents here, that a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates the statute and the Rule.

*Id.* at 476, 97 S.Ct. at 1302.

While many of the cases Bendix cites do indeed stand for the proposition that in considering a "manipulation" claim a court should determine whether management's self preservation was the sole or primary motivation for the target company's actions, none of the cases accurately state the law as it exists after the Supreme Court's 1977 interpretation of Section 14(e) in *Piper. Royal Industries, Inc. v. Monogram, Inc.* [1976–77 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 95,863 (C.D.Cal.1976), was decided before *Piper. Applied Digital Data Systems,* 425 F.Supp. 1145 (S.D.N.Y.1977), relies heavily on both the later overruled circuit opinion in *Santa Fe Industries, supra,* and an earlier circuit opinion in the *Piper* litigation which squarely conflicts with the reading of Section 14(e) given in

the 1977 *Piper* decision. The court in *Podesta v. Calumet Industries, Inc.* [1978 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 96,433 (N.D.Ill.1978), heard a case which involved not merely target management's efforts to frustrate control but also nondisclosures by the target management about its self-interested efforts. Indeed, the *Podesta* court appears to recognize the need to find an element of deception in order to state a violation of 14(a):

> Count II alleges various violations of Section 14(a) of the Exchange Act and the rules thereunder. The defendants' main objection to the sufficiency of this count is their contention that it merely alleges non-disclosure of what the plaintiff claims are violations of state law, and that management is not required by Section 14(a) to disclosure its breaches of fiduciary duty. The defendants rely on *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462 [97 S.Ct. 1292, 51 L.Ed.2d 480] (1977), for the proposition that a federal securities law claim for deception is not stated by a recitation of breach of a fiduciary duty.
>
> In *Santa Fe,* the Court was presented with a case where there was no deception or misrepresentation alleged, and where the only charge was that a short form merger between a parent company and its subsidiary was "unfair" to minority shareholders. The Court found that this did not state a claim under 10(b) because it did not involve a "manipulative or deceptive device." In further discussion, the Court reiterated that the fundamental purpose of 10(b) is to implement the "philosophy of disclosure." The Court clearly distinguished cases in which the breaches of fiduciary duty included some element of deception and thus could violate 10(b). 430 U.S. at 475 [97 S.Ct. at 1301]. . . .

In this case, the plaintiff has alleged that management's proxy solicitations contain statements involving the ESOP and warrant transactions which are misleading and omit material facts. This is sufficient to state a claim and survive a

630

motion to dismiss, *Conley v. Gibson,* 355 U.S. 41 [78 S.Ct. 99, 2 L.Ed.2d 80] (1957). *Podesta, supra* at 93,555.

In a temporary restraining order case which, while not *ex parte,* was necessarily hurried, Judge Pollock gave a broad reading to Section 14(e) without considering either *Piper* or the Second Circuit's opinion in *Lewis. Joseph E. Seagram & Sons, Inc. v. Abrams,* 510 F.Supp. 860 (S.D.N.Y.1981). *Seagram* is thus not the law in the Second Circuit and will not be followed here.

Perhaps the strongest case Bendix presents to this Court is *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir. 1981). This case does squarely hold that "manipulative" conduct under Section 14(e) can extend beyond deception to interference with the natural forces of supply and demand. However, the *Mobil* decision is an exceptionally strained interpretation of *Santa Fe. Mobil, supra* at 373–376. *Mobil* fails to interpret the *Santa Fe* court's definition of "manipulation" in light of the previously quoted *Santa Fe* language that "the cases do not support the proposition ... that a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates the statute...." *Santa Fe,* 430 U.S. at 476, 97 S.Ct. at 1302. More importantly, the *Mobil* court does not even address the clear *Piper* language interpreting Section 14(e). It is not surprising that the *Mobil* decision has been significantly criticized. *See, e.g., Marshall Field & Co. v. Icahn,* 537 F.Supp. 413, 422 (S.D.N.Y.1982). Consequently, a more reasoned path to follow is the language of *Piper,* the Second Circuit's interpretation of Section 14(e) in *Lewis,* and the Seventh Circuit's interpretation of Section 14(e) in *Panter.*

■ When turning to the argument that the "front-end loaded" nature of the Marietta offer is "manipulative," the Court finds the previously discussed authorities dispositive. Bendix argues that the illegality of the two tier structure lies in its coercive nature, but *Piper* clearly dictates that Section 14(e) is violated only in instances of deception. If the counter offer is in fact "coercive," it would only be because its two tier structure is revealed all too well.

Even in the Sixth Circuit after *Mobil,* a District Court in *dicta* expressed some doubts about the wisdom of condemning "front-end loaded" offers:

At the outset, it should be recognized that any tender offer is likely to be coercive to some degree. A shareholder is faced with a limited time in which to decide whether to accept the offered price for his shares, usually at a premium over that at which the stock was previously trading, or decline the offer and face the attendant risks. The risk is that a substantial percentage or the majority of his fellow shareholders will find the price acceptable and tender. His retained shares may then suffer a diminution in value, or impairment as to marketability. The prospect of being "frozen out" through a subsequent merger or reverse stock split is also increased. Despite this inherent "coerciveness", Congress has not outlawed tender offers but only sought to regulate them, primarily through mandatory disclosure provisions.

Plaintiffs have not cited any case where a two-step transaction with a disparity in the consideration offered at either stage has been found to violate either § 10(b) or 14(e). On the contrary, both the case law as well as pertinent SEC Rules and Regulations appear to contemplate such pricing arrangements. In *Mobil, supra,* the United States Court of Appeals for the Sixth Circuit recognized that shareholders "not tender[ing] their shares to U.S. Steel would ... risk being relegated to the 'back end' of U.S. Steel's takeover proposal and only receive $90 per share," and yet extended the offer as part of the relief granted. In a similar vein, SEC Rule 13e–3 provides an exemption from its coverage for second step "clean up" transactions, such as mergers, within one year after a tender offer, provided that the consideration offered to unaffiliated shareholders during the second step is equal to the highest consideration offered any shareholder

during the tender offer. Where this "equal consideration" rule is not met, the "going private" transaction is subject to Rule 13e–3. Rule 13e–3 thus, by negative implication, acknowledges that such transactions occur and purports to regulate the second step of such two-tier transactions.

*Radol v. Thomas,* 534 F.Supp. 1302, 1312 (S.D.Ohio 1982).

## WILLIAMS ACT: NONDISCLOSURE AND MISSTATEMENT CLAIMS

■ Bendix stresses two major disclosure errors: "Stockholders were not and have not been informed of: [1] the severe adverse financial consequences of the offer or [2] the plan to dispose of significant portions of the combined businesses, including many lines of business that had formed the core of Marietta and Bendix." The Court has carefully examined the Marietta offer in light of the voluminous documentary materials in the record and has determined that adequate disclosure has in fact been made in each instance.

There certainly is no question that consummation of the Marietta offer will cause Marietta to become highly leveraged. Similarly, Marietta will most likely reduce its unfavorable debt/equity position at least in part by sale of some of Bendix' non-aerospace businesses. However, while maintenance of the poor debt/equity ratio might be detrimental to any combined entity, it does not necessarily follow that disposition of the non-aerospace assets would be the financial disaster that Bendix claims. Leaner is not necessarily weaker; in light of the apparent agreement among the parties that Marietta has had a good track record in running its aerospace businesses, a streamlined Marietta could emerge as a very powerful company. More importantly, even if one assumes that financial problems are indeed down the road for Marietta, its offer clearly indicates that possibility. Page 13 of the Offer to Purchase reads: "The borrowings [to finance the offer] may limit Martin Marietta's ability to effect substantial future debt financing and may cause a reduction in Martin Marietta's cred-

it ratings." More importantly, the offer directly predicts the impact an acquisition of Bendix after Bendix had completed its offer would have:

> Because the Company [Marietta] began the Company Offer before Martin Marietta began its Offer, the Company, absent delays in its ability to purchase under the Company Offer, would be able to purchase Martin Marietta's common stock before Martin Marietta can purchase the Company's stock. Accordingly, while, as indicated above, Martin Marietta would probably be able to exercise control of the Company prior to the Company exercising control of Martin Marietta, it is possible that both Martin Marietta and the Company could each become a substantial stockholder in the other. In such an event, the utilization of the Company's cash and the borrowings required by both the Company and Martin Marietta to purchase stock of each other would limit Martin Marietta's ability to effect substantial future debt financings and would cause a reduction in the credit ratings of Martin Marietta, whether or not a merger or similar combination of Martin Marietta and the Company is consummated.

Martin Marietta's Offer to Purchase at 15–16. Thus, Marietta twice waves the red flag of declining bond/credit ratings. This blunt assessment is sufficiently stark to put any reasonable investor on notice that Marietta may have some rough financial waters ahead.

■ The final Williams Act issue is whether Marietta inadequately disclosed any "plans or proposals" it may have to sell Bendix' non-aerospace divisions. As in the opinion on the legality of the Bendix offer, this Court can find no "plans" in the sense of a "detailed scheme" or carefully crafted written outline to divest. Given the time constraints Marietta faced in response to the surprise Bendix offer, it would be indeed surprising if it had formulated a clear plan.

On the other hand, as indicated earlier, balance sheet difficulties probably will compel Marietta to divest. Bendix has produc-

ed ample evidence to demonstrate that the Marietta management is well aware that divestiture may be necessary. However, the Marietta offer has also clearly disclosed this significant risk of divestiture. On page 17, the Offer to Purchase states that Marietta has no plans or proposals to divest "except as noted above or elsewhere in this Offer." One paragraph "elsewhere in this Offer" states:

> Although a determination regarding repayment or refinancing of Borrowings has not been made, the Borrowings are expected to be repaid from proceeds of medium or long-term debt or equity issues (the terms of which will depend on market conditions and other factors prevailing at such times), asset dispositions and from internally generated funds which may, after any merger or business combination with the Company, include funds generated by the Company, cash and the proceeds of short-term investments and marketable securities or other asset dispositions. No determination has been made regarding the method of repayment or refinancing of Borrowings. The Borrowings may limit Martin Marietta's ability to effect substantial future debt financings and may cause a reduction in Martin Marietta's credit ratings.

Marietta Offer to Purchase at 12–13. While this language certainly indicates that a final decision has not been made, it also suggests that asset dispositions are expected and that the asset dispositions may go beyond the liquidation of "short term investments and marketable securities." The Offer to Purchase further acknowledges that in the event Bendix has also completed its tender offer there will be little cash available:

> it is possible that both Martin Marietta and the Company could each become a substantial stockholder in the other. In such an event the utilization of the Company's cash and the borrowings required by both the Company and Martin Marietta to purchase stock of each other would limit Martin Marietta's ability to effect substantial future debt financings and would cause a reduction in the credit

ratings of Martin Marietta, whether or not a merger or similar combination of Martin Marietta and the Company is consummated.

Marietta Offer to Purchase at 15–16. When these three passages are considered as a whole, the Marietta offer unmistakably discloses that: 1) Marietta has no underlying desire to divest, 2) Marietta expects some divestitures in order to refinance and 3) the availability of Bendix' cash as an alternative refinancing source will disappear if Bendix also completes its offer. This disclosure sufficiently predicts the scenario that is likely to occur.

The fact that this divestiture may well be of a large magnitude does not alter this analysis. Bendix urges that Marietta should have revealed that its dispositions might approach one billion dollars, yet Bendix contemplated dispositions of a like amount without apprising the public of its magnitude. More importantly, it is inherent in a takeover battle of this size that all numbers are bound to be large. The Court agrees with Marietta that Bendix has been using the one billion dollar figure for largely "shock value."

The cases cited by Bendix are inapposite. The *Prudent Real Estate* case holds that the financial condition of certain interests lying behind a real estate investment trust is material. *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140 (2nd Cir. 1979). In the case at bar, it is assumed that the financial condition of Marietta is material; the only issue is whether it has been adequately disclosed. Similarly, the court in *Riggs National Bank of Washington, D.C. v. Allbritton,* 516 F.Supp. 164, 175 (D.D.C.1981), held that the net worth and other financial aspects of a noncorporate tender offeror were material. Marietta has provided a financial statement; it also has revealed more about its refinancing than did the *Riggs* defendant. Finally, the *Kaufman and Broad* case required disclosure of certain contracts and provisions about an offeror's financing not in issue here. *Kaufman and Broad, Inc. v. Belzberg,* 522 F.Supp. 35 (S.D.N.Y.1981).

The words of Judge Friendly are far more appropriate than any of the cases cited by Bendix:

> Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make a new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. It would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them.

*Electronic Speciality Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2nd Cir. 1969).

## MARYLAND COMMON LAW CLAIMS: BREACH OF FIDUCIARY DUTY

Bendix claims that Marietta's directors have violated their fiduciary duties under Maryland common law because they are proceeding with Marietta's offer contrary to the known wishes of Bendix, Marietta's new majority shareholder.

■ In Maryland, as elsewhere, directors of a corporation occupy a fiduciary relationship to the corporation and its stockholders. *Devereux v. Berger,* 264 Md. 20, 284 A.2d 605 (1971); *Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 242 A.2d 512 (1968), *cert. denied,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); *Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946). Directors have the duty to act in a manner they reasonably believe to be in the best interests of the corporation. Md.

Corps. & Ass'ns Code § 2–405.1(a)(2); *Indurated Concrete Corp. v. Abbott,* 195 Md. 496, 74 A.2d 17 (1950); *Rosenbloom v. Electric Motor Repair Co.,* 31 Md.App. 711, 358 A.2d 617 (1976).

■ Accepting for the moment the doubtful proposition that Maryland law requires a board of directors to accede to the wishes of a majority shareholder,[5] one should realize that it is the wishes of Bendix' shareholders, not Bendix' management, that Marietta's board of directors must keep in mind. This is so for the simple reason that it is Bendix' shareholders, not Bendix' management, who beneficially own a majority of Marietta. In exercising its equitable judgment this Court can—and, indeed, must—look beyond the corporate entity of Bendix to Bendix' shareholders in determining to whom, if anyone, Marietta's board owes fiduciary duties. *See Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.,* 275 Md. 295, 312, 340 A.2d 225 (1975) (corporate entity will be disregarded to enforce a paramount equity).

■ This Court finds that, in refusing to halt Marietta's offer, Marietta's board of directors has acted in a manner reasonably believed to be in the best interests of Bendix' shareholders. The record shows that Marietta's board reasonably believes that a combination of the two corporations would be best achieved pursuant to the terms of Marietta's offer rather than Bendix' offer. There is substantial evidence that it is the considered view of Marietta's board that Bendix' current management has little managerial competence or experience in Marietta's businesses and, as a result, Marietta's management would be more compe-

---

**5.** Bendix relies heavily on *Cummings v. United Artists Theatre Circuit, Inc.,* 237 Md. 1, 204 A.2d 795 (1964), for the proposition that normally a board of directors may not take action known to be disapproved by the majority of stockholders. *Cummings* does not stand for this proposition nor, as far as this Court is aware, does any other Maryland case. Rather, *Cummings* does quote Judge Learned Hand to the effect that directors "one day before they know they are to be displaced" cannot normally take actions contrary to their majority shareholders. This quotation has no application to the instant case because, due to differences in

Maryland and Delaware state law, Marietta's directors "knew" that if they proceeded with Marietta's offer, they would probably not be displaced by Bendix in a day or even in the foreseeable future. Despite Judge Hand's words, there is no reason to believe that a Maryland corporation's directors, even faced with a request from a majority shareholder, must always accede to that request. *See* Md. Corps. & Ass'ns. Code § 2–401(b) ("The board of directors may exercise all the powers of the corporation, except those conferred on or reserved to the stockholders by law or by the charter or bylaws of the corporation").

tent to manage the combined Bendix-Marietta entity than Bendix' management. While the record also shows that Marietta's management has little experience in Bendix' non-aerospace businesses, this Court cannot, in keeping with the Maryland business judgment rule, say that it is unreasonable for Marietta's board to adhere to its view. *See Devereux, supra; Parish v. Maryland & Virginia Milk Producers Ass'n, supra.*

It is significant that only two of Marietta's fourteen directors are part of Marietta's management. The others are distinguished businessmen, attorneys and educators. There is simply no credible evidence in the record that in proceeding with its tender offer Marietta's board was not acting in good faith and in furtherance of what they reasonably believed to be a good corporate purpose. *Cummings v. United Artists Theatre Circuit, Inc.,* 237 Md. 1, 15, 204 A.2d 795 (1964) (court upheld an agreement entered into by a corporation's board even though the board wrongfully, but in good faith and in furtherance of a good corporate purpose, denied a request for a special stockholders' meeting). Bendix' "evidence" to the contrary is nothing more than innuendo and self-serving statements by Bendix' management and financial advisors. Innuendo, without credible evidence, simply cannot be the basis for the extraordinary relief sought by Bendix.

Bendix further claims that Marietta's board members have breached their fiduciary duties to the remaining Marietta shareholders by pursuing a course of conduct that is to their financial detriment for the sole purpose of preserving the positions of Marietta's management.[6] Bendix relies heavily on an affidavit by Jay Higgins of Salomon Brothers, Bendix' financial advisor, that the second step of the Bendix offer (*i.e.* exchanging .82 of a share of Bendix common stock for each share of Martin Marietta stock) is "materially more valuable than the Martin Marietta plan in terms of the value represented by each Marietta share under the terms of the two combinations." Marietta argues that Higgins' affidavit is replete with factual and analytical errors. This Court need not decide who is right because the aforementioned factual finding that Marietta's board reasonably believes that its offer is in the best interests of Bendix' shareholders applies with equal force to Marietta's remaining shareholders. *See Devereux,* 264 Md. at 32, 284 A.2d 605 (it is not proper for a court to "substitute its judgment for that of the persons who are lawfully in control of a corporation's affairs.")

By refusing to halt its offer, Marietta's board is permitting Bendix' shareholders to freely exercise their own judgment as to whether the Marietta offer is in their own best interests. Indeed, Bendix, as the majority shareholder of Marietta, owes fiduciary duties to Marietta's other shareholders not to force Marietta to abandon a desirable business opportunity. In *Clagett v. Hutchison,* 583 F.2d 1259, 1263 (4th Cir. 1978), the Fourth Circuit observed that Maryland law prohibits a controlling shareholder from using his control for some ulterior purpose adverse to the interest of the corporation and its stockholders.[7]

PUBLIC INTEREST

[10] As noted in the opinion denying the preliminary injunction against Bendix' of-

---

6. Marietta argues that Bendix does not have standing to complain of Marietta's directors' breach of fiduciary duties to the remaining Marietta shareholders because Bendix does not fairly and adequately represent the interests of the other Marietta shareholders. *See* Fed.R. Civ.Pro. 23.1. Marietta cites an impressive list of cases where stockholders, in similar situations to that of Bendix in this case, were not permitted to bring derivative suits on behalf of all the stockholders. In light of the finding that Marietta's directors did not breach their fiduciary duties, this issue need not be reached.

7. In this context it is interesting to note the language of the Supreme Court in *Precision Co. v. Automotive Co.,* 324 U.S. 806, at 814, 65 S.Ct. 993, at 997, 89 L.Ed. 1381 (1945), where the Court stated:

> The guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the

fer, the public interest requires that a tender offer, probably legal, be permitted to proceed without intervention by the courts. *See Edgar v. MITE Corp.,* ——— U.S. ———, ———, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982) (discussing the benefits of tender offers to the public). "The stockholders are entitled to exercise their own judgment as to these matters . . . . The decision whether to buy, exchange, or do neither should rest with each individual stockholder." *Conoco, Inc. v. Seagram Co.,* 517 F.Supp. 1299, 1303–04 (S.D.N.Y.1981).

In conclusion, the Court finds that although the balance of hardship is a draw, Bendix has failed to show that it is likely to succeed on the merits of its claims. Moreover, it is in the public interest for Marietta's offer to go forward.

Accordingly, for the reasons stated herein, it is this 22 day of September, 1982, by the United States District Court for the District of Maryland, ORDERED:

That Bendix' motion for a preliminary injunction BE, and the same IS, hereby DENIED.

defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity."

The requested relief would be inappropriate when Bendix is engaging in conduct not unlike the conduct of which it is complaining.